Tina C. Poulin
*vs.*
Robert J. Bilodeau and C. K. Clauson, Inc.

Kennebec.    Opinion, July 8, 1965.

*Jerome G. Daviau,* for Plaintiff.

*Bradford H. Hutchins,*
*Roger A. Welch,*
*William P. Niehoff,* for Defendants.

Sitting: Williamson, C. J., Webber, Tapley, Sullivan, Marden, Rudman, JJ.

Sullivan, J.    Plaintiff owns a residence which the defendant corporation had supplied with heating oil upon a "keep-full" or automatic oil service undertaking and under-

standing for some 8 or 10 years. Defendant Bilodeau is a delivery truck operator for the corporation.

On October 2, 1962 the plaintiff telephoned the corporate defendant and advised its manager that she was about to go away for some 6 weeks and requested that a man be sent to make sure that her oil tank was full. The corporate defendant on September 10th prior to the 'phoning had delivered 201 gallons but plaintiff desired assurance that the tank was completely filled during her absence against any incidence of cold weather. The tank had been in use for 22 years without leaking or malfunction.

On October 3, 1962 the defendant company responsively filled the tank by adding 172.9 gallons. The capacity of the tank was 275 gallons.

On October 29, 1962 the company professing to exercise its systematic vigilance for its customer's fuel supply sent its driver who just after noon pumped 128.2 additional gallons into plaintiff's tank. About 5 P.M. the defendant corporation was notified by plaintiff's sister that much of plaintiff's cellar floor about the tank was covered with oil.

Plaintiff filed a complaint against the defendants for damage to her residence and to some of her personal property because of oil spillage and for consequential physical sufferings of the plaintiff which she attributes to her exposure to oil fumes or odor after her return home.

A consolidated jury trial was had and verdicts were returned for the defendants. Plaintiff has appealed and has stated 11 points of appeal.

In her argument here the plaintiff has condensed her protestations to 8 issues.

"1. *Whether or not the evidence showed, conclusively, a trespass by the Defendant.*"

At the trial there was a conflict of evidence. Plaintiff testified that on October 2, 1962 during her 'phone conver-

sation with Mr. Meader of the corporate defendant she advised him that in her absence from home she would not be needing any oil, that the house would be closed.

Bernadette DeRosby, plaintiff's witness, who had overheard the plaintiff conveying 'phoned instructions to Meader remembered only that the plaintiff had informed Meader that the former wished him to bring some oil as she was going abroad for 5 or 6 weeks.

Meader, manager of the oil company, testified that the plaintiff over the 'phone said that she wished to have her oil tank filled, that she was going away and wished to be sure that the tank was full.

It was for the jury to decide what had been the plaintiff's message to Meader.

Plaintiff testified that for 8 or 10 years she had purchased oil from the defendant company upon the automatic oil service plan:

"- - - - as many people do. In other words, we never had to worry about oil being sent to the house because they would come at whatever time they thought."

There was evidence that the defendant company in filling the tank on October 2nd and on October 29, 1962 acted only as it had in the same service for years. Access to plaintiff's garage and to the intake pipe had been left unlocked so that oil service was physically unrestricted.

A recital in detail of the mathematical and scientific testimony is unnecessary. It will suffice to state that the jury had ample basis to infer that the greater portion of the oil which Mrs. Thompson discovered on the plaintiff's cellar floor at 5 P.M. ± on October 29, A. D. 1962, some 4 or 5 hours after the defendant dealer had deposited 128.2 additional gallons in the tank, had leaked from the tank prior to

October 29, 1962 when the dealer made that delivery. There was evidence to sustain a fact finding that on a side of the tank midway between top and bottom there was found on the late afternoon of October 29, a dent and near it a split in the weld-seam. Expert testimony founded upon significant and adapted experimental tests stated that of the brand of oil delivered leakage through the parted weld for a period of several hours in excess of 4 or 5 would have been necessitated to produce the amount of spillage which witnesses found upon the cellar floor on October 29th. There was credible evidence that the pumping of the oil into the tank did not rupture the tank in refutation of plaintiff's theory.

At the close of the charge to the jury by the presiding justice the plaintiff requested the following instruction:

"In trespass, even though the tank crack resulted from metal fatigue, or from any other cause, still, if the oil delivery on October 29, 1962 was without permission of Plaintiff, express or implied, then all the damages that flow therefrom (sic) said delivery of oil may be recovered by the Plaintiff."

The request was denied. The presiding justice had comprehensively treated the topic of trespass so as to render unnecessary plaintiff's request.

"2. *Whether or not as a matter of law Dr. Wadlin was qualified to testify as an expert.*"

Dr. Wadlin, professor of civil engineering and head of the civil engineering department of the University of Maine, qualified as a specialist in structural engineering, in the use of materials, steel and aluminum in the construction of buildings, bridges and other public structures. His specialty required the study of stresses and strains, the properties of various materials and the behavior of metals under stress.

The tank with attachments had been delivered to Dr. Wadlin. The tank with its attachments as it came to Dr. Wadlin, witnesses swore, was in the same condition as it had been on October 30, 1962 before the tank had been removed from its installation in the Poulin basement. The tank was filled for him with oil during an experiment by the same person in the same manner and under the same circumstances as it had been filled in the plaintiff's home on October 2nd and 29th, 1962. The oil used in the experiment was the same kind burned by the plaintiff. A static pressure test was also conducted by the doctor. The jury during the trial viewed the tank. The tank was 14 U. S. gauge.

The doctor in all made 3 tests by filling the tank with the oil once and with water twice. He testified that the water and the oil for the testing purposes were quite equivalent. He measured and reported leakage over an unbroken period of 22 hours. He utilized Ames dials to measure the movement of the end and the sides of the tank and the opening and closing of the slit or crack in the weld as the tank was filled and its contents seeped away down to the level of the crack or slit. His experiments supplied the observations and findings which he related in testimony as to the reactions of the tank. Upon these phenomena and in conjunction with the testimony as to the events and the facts observed by various witnesses at the Poulin residence the doctor gave reasoned conclusions as to the leakage of oil in the plaintiff's basement, the manner of the leaking, its cause, incipience, duration and extent.

When the doctor was asked for his opinion as to what had caused or effected the crack or slit in the welding strip of the tank the plaintiff objected that the doctor had not qualified as an expert in metallurgy. The doctor disclaimed any profession of being an expert metallurgist but he did affirm that he as a specialist in the science of metals under stress had formed an opinion.

The presiding justice was well within the bounds of sound discretion in recognizing the witness as an expert in his specialty.

> "Whether a witness called as an expert possesses the necessary qualifications is a preliminary question for the court. The decision is conclusive unless it clearly appears that the evidence was not justified, or that it was based upon some error in law - - - - - " *Hunter* v. *Totman,* 146 Me. 259, 268.

> 3. *Whether or not Dr. Wadlin's experiment was legally valid; whether it was 'substantially similar' to the original occurrence so as to render it admissible."*

The record contains credible testimony accounting for the disposition, custody and location of the oil tank after its detachment from the Poulin household heating system until and throughout the experiments. Mr. Bilodeau who had delivered the oil to the Poulin residence in October, 1962 participated in the oil pumping experiment at the University of Maine. He testified that circumstances and properties attendant at that experiment were fairly identical to those which had obtained at the Poulin residence with respect to the tank before the tank was removed on October 30, 1962. Bilodeau related that during such experiment he pumped the type of oil used by the plaintiff into the tank at the same pressure used in the pumping on October 2 and 29, 1962. The doctor conducted a static pressure test with water and an additional test with water as hereinbefore described in this opinion.

The experiments of Dr. Wadlin were competent and legally qualified evidence.

> "4. *Whether or not the hypothetical question asked of Dr. Wadlin was, under all the circumstances of the case, legally admissible."*

The hypothetical question propounded by the defendants was as follows:

"If you assume that a tank has had a blow or dent on the side of the tank, that it has the type of weld that occurred on this tank, that it has been used and filled and unfilled, or emptied, over a period of years since 1940, that oil had been introduced into the tank at the rate it was introduced at the time it was tested by you, and having in mind the studies that you made of the expansion and contraction of the sides, ends and seams, what in your opinion would be the result?"

There was evidence in the record that oil had been introduced into the tank at the Poulin home from 1940 to October, 1962 but such evidence did not pretend to establish that the oil had always been introduced at the same rate at which it had been pumped at the time of the experiment of Dr. Wadlin and Bilodeau.

The plaintiff objected to the question. The presiding justice permitted the question over plaintiff's objection.

The doctor testified as follows:

"From my examination of the tank, it is my opinion that it had received a blow on the side wall causing it to be indented about five-eighths of an inch. And at the same time, examining the end wall on the opposite side of the crack from the indentation, there was a bulging of the wall, which would be caused as you push in one side, and the corner being welded, it would transmit that force around to the other side, rotating it to an angle, such that when one side went in the other would come out. And at such time, it is my opinion that it weakened the weld, which is nothing more than a butt weld with two pieces of metal running parallel at that point. And I feel that during the course of years, when it was filled and emptied, that there was enough flexing in the tank to eventually open up the crack, which became worse as time went along."

It is manifest that the doctor's reply to the hypothetical inquiry was not responsive. Yet it was not actually evasive.

It was especially germane to the critical issue of what had caused the rupture or slit in the welded strip of the Poulin tank. The question posed sought an expert answer concerning a supposititious tank. The doctor's response concerned only the very tank which is so controversial in the case at bar. In fine the doctor did not answer the hypothetical question addressed to him.

The doctor's response assumed fillings and depletions of the tank "during the course of the years" but made no reference or assumption as to any rate at which the oil had been deposited in the tank or to any express number of fillings or drainings. The reply contained no conclusion based upon facts as to which no evidence exists in the record. Unobjectionable questioning would have readily elicited the substance of his answer. The reply was supported by the doctor's reported investigation and experimentations and his deductions from them. The answer was one which the doctor within his professed specialty would be competent to render and the information imparted by him was pertinent for jury consideration.

The doctor's statement did not assume an evidentially unsupported supposition at least arguably incorporated in the hypothetical question that oil had been introduced in the Poulin tank since 1940 at the same rate at which the defendants placed some oil there in October, 1962. The answer could not have been misleading to the jury. Rate of fill during the years was not an indispensable factor in the answer given.

The doctor had made experiments to establish the manner and extent of the opening of the slit in the tank's welding, the movements of the side walls and of an end of the tank and had testified as to his observations.

Plaintiff made no motion to have the answer stricken as unresponsive and was accorded full scope and latitude of cross examination.

There was no prejudicial error in the admission of the statement of the doctor made on the occasion of the hypothetical question.

In the case of *Mutual Benefit Health & Accident Association of Omaha* v. *Hickman* (1959), 110 Ga. App. 348, 111 S. E. (2nd) 380 a hypothetical question addressed to a physician had contained an assumption of the rate of speed of an automobile although no evidence existed in the case in support of such speed. The court at page 390 held:

> "The objection to the doctor's testimony was not valid for another reason. The doctor did not, according to his own answer, accept the statement as to the speed of the deceased's truck as the predicate for his opinion - - - -"

> "5. *Whether or not the court erred in excluding the pressure chart produced by Fred Haight and the regulations offered as Exhibit No.       ."*

The "pressure chart for oil tank" by Fred R. Haight, an engineer and witness in the case at bar, was identified as plaintiff's exhibit number 9. The exhibit was not offered in evidence and was neither admitted nor excluded by the presiding justice.

Plaintiff offered in evidence her exhibit numbered 6 and her exhibit number 8, both duplicate booklets. These booklets contained copies of R. S., 1954, c. 82-A, (32 M. R. S. A., § 2301, ff.), relating to the licensing of oil burner installers and service men, and copies of standards issued by the Oil Burnermen's Licensing Board under authority of the above named statute. The standards regulated the installation of oil burning equipment.

Plaintiff's exhibit 6 was offered twice by the plaintiff but no ruling was made by the court. Plaintiff offered the exhibit a third time and it was excluded by the justice. Later plaintiff offered her exhibit 8, the certified or authenticated

duplicate of her exhibit 6, and the following colloquy was had between the presiding justice and plaintiff's counsel:

"Mr. DAVIAU: No, your Honor, but this is a regulation. I said yesterday that it had the force of law, and then I wasn't sure of it, so I looked at the statute again, and I think the regulation stands on its own feet. I don't understand that the Court has to take judicial notice of regulations, and I can't take a chance.

"The COURT: What part of this do you have in mind?

"Mr. DAVIAU: Let me look at my copy here. Chapter 2, Section 1101, if that is the same one in the new volume.

"The COURT: Yes.

"Mr. DAVIAU: 'Design and construction of tanks.'

"The COURT: Do you refer to Section 1102 also?

"Mr. DAVIAU: Well, I suppose either party can, yes.

"The COURT: Do you?

"Mr. DAVIAU: I may. I don't know how things will turn out, your Honor. But it is there, and I won't shrink from any of it.

"The COURT: Well, I think this matter is properly before the Court. I don't think it is a matter of an exhibit before the jury, but it is properly called to the attention of the Court.

"Mr. DAVIAU: That is all I wanted to do, your Honor; not the jury"

Obviously the disposition of this matter by the court was made to the full satisfaction and accord of plaintiff's counsel. There was no error with respect to plaintiff's exhibit 6 or 8.

"6. *Whether or not the verdict was contrary to the evidence*

"7.   - - - - - *contrary to the law applicable.*

"8.   - - - - - *was against the weight of the evidence.*"

We have examined the record which reports the 3 day trial and is extensive.   Without belaboring matters unnecessarily it will suffice to say that if we view the evidence in the light most favorable to the defendants there was sufficient credible evidence to justify the verdict which cannot be said to be manifestly wrong.   *Bragdon* v. *Shapiro,* 146 Me. 83, 84.

It cannot be said that the verdict was contrary to the law which the presiding justice correctly and adequately communicated to the jury without objection by plaintiff's counsel save for the written request for an instruction which we have hereinbefore considered fully.

To support the verdict here there was credible evidence adequate to satisfy the minds of reasonable men.   *Walker* v. *Norton,* 131 Me. 69, 70.

The mandate shall be:

*Appeal denied.*