**STATE of Maine**

*v.*

**Lauren RUYBAL.**

Supreme Judicial Court of Maine.

March 5, 1979.

Charles K. Leadbetter (orally), John R. Atwood, Asst. Attys. Gen., Richard S. Cohen, Deputy Atty. Gen., Augusta, for plaintiff.

Lewellyn R. Michaud, Bangor (orally), Philip L. Ingeneri, Bangor, for defendant.

Before POMEROY, WERNICK, ARCHIBALD, DELAHANTY, JJ., and DUFRESNE, A.R.J.

DELAHANTY, Justice.

A Penobscot County jury found the defendant guilty of the murders of his wife's mother and great-uncle. The Superior

Court entered a judgment of conviction and sentenced the defendant to life imprisonment.

This appeal raises three issues for our consideration:

(1) Whether the defendant's incriminating statement was admitted into evidence in violation of *Miranda v. Arizona,* 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966).

(2) Whether an affidavit supplied probable cause for the issuance of a warrant authorizing the taking of hair samples from the defendant's body.

(3) Whether the jury should have been informed of the penal consequences of a verdict of not guilty by reason of mental disease or defect.

Finding no error, we deny the appeal.[1]

The defendant, his pregnant wife, and their two children lived in a mobile home in Bradley, Maine. On the evening of November 13, 1972, at approximately 11:00 p.m., the defendant got into bed with his wife, Carol. She complained that he was "all wet." Without comment, he got out of bed, dressed in the clothes he had worn that day, and left the house. He was observed at two local bars where he consumed several beers and several tequila drinks. He next appeared at the Old Town apartment of Karen Granville.

Granville testified that the defendant requested her to have sexual relations with him, that she refused, and that she subsequently fixed two vodka drinks for the defendant whom she described as highly intoxicated. When asked whether she had surreptitiously fed the defendant half of an LSD tablet, she initially stated that she could not be sure; she later amended her story, however, saying that it was "probable" that she had slipped him the substance.

In the early morning of November 14, the defendant left Granville's apartment and drove to the home of Henry and Rose Pearson, his wife's parents, located in the French Island section of Old Town. His activities while inside the Pearson house are known largely through the defendant's signed confession the admissibility of which we shall have occasion to discuss. In pertinent part it reads as follows:

[After entering the house, t]he next thing I remember is walking into Rose's room. At this time the light was off. Rose sat up in bed and asked what I was doing there. I told her I got mad at Carol and went to see [Karen] and she turned me down.

I had relations with my mother-in-law once before about 2 years ago. Rose had told me if I was going to run out on Carol to come to see her first. Rose was dressed in a nightgown and was without pants. She agreed to have relations with me. I started to undress and Rose told me to hurry up and get into bed. We were having intercourse when Uncle Bill [William Grounder, who resided in the Pearson house,] came into the room. Rose told him to get out. I got up and started to push him out of the room. Uncle Bill called Rose an old whore and he called me names I can't remember.

The next thing I remember is being downstairs. I complained of a headache and Uncle Bill went to the medicine cabinet. I recall going in and fighting with Uncle Bill. I then recall looking down and seeing my knife in my hand. Uncle Bill was laying on his side between the wall and the flush. I saw the blood on the floor. It was lumpy. I don't remember leaving the bathroom.

---

1. Although the State has cross-appealed from the suppression of certain evidence found in the defendant's home, our denial of the defendant's appeal precludes consideration of the merits of the cross-appeal.

We also note that at the defendant's request our resolution of this case has for some time been held in abeyance by order of the Chief Justice pending disposition of the defendant's motion for a new trial. Further delay ensued when the untimely death of the trial Justice, who heard the motion, intervened after testimony on the motion had been taken but before a decision had been rendered. On January 25, 1979, the Justice assigned to deal with the motion concluded his review of the transcript of the hearing and issued a decision denying the motion.

The next thing I remember was chasing Rose around through the rooms in a circle. The next thing I remember is fighting with Rose by the doorway leading onto the front porch. The next thing I remember is holding Rose down. I had her head under my left arm. Then I recall looking back at Rose from the doorway. She was laying on her left side.

. . .

Leaving the Pearson house, the defendant returned to his home at around 4:00 a.m., removed his clothes, and got into bed with his wife.

The bodies of William Grounder and Rose Pearson were discovered at 7:30 that morning. Grounder's body lay in a pool of blood in the downstairs bathroom; Pearson's body, which displayed unmistakable signs of strangulation, was on the front porch. Both bodies were riddled with deep stab wounds.

Shortly after State and local police had begun their investigation at the scene of the Grounder-Pearson homicides, the defendant appeared in the vicinity of the crime and struck up conversations with several members of the investigation team. The defendant was identified to State Police Detective Hall as a relative of the victims, and accordingly Hall asked the defendant to accompany him to the Old Town police station for questioning. The defendant agreed.

Arriving at the station, the defendant was escorted to an office and questioned briefly by Detective Hall. No inculpatory statements were made at this time. The police then decided to ask the defendant to submit to a benzidine test: a chemical test used to detect the presence of blood which is not otherwise visible to the naked eye. In order to secure a legally valid consent to the test, an Assistant County Attorney read the defendant his *Miranda* rights and, after the defendant had signified that he understood those rights, the Assistant County Attorney, as he later related,

> explained to him that *he should keep [the Miranda] rights in mind, not only in view of any questioning that would be placed to him by any persons again in connection with the matter that we were concerned with,* but as well as a test that he was going to be asked to take. (emphasis supplied).

The nature and the purpose of the test were then explained to the defendant, and he was cautioned that he could withdraw his consent to the test at any time. The defendant indicated his willingness to take the test but stated that he had "gutted a rabbit" the previous evening and had not had occasion to wash up before going to bed and then to work that morning. The benzidine test was positive.

After further questioning, the defendant was asked to turn over the clothes he had worn on the previous day for another benzidine test. The defendant agreed and was taken to his home by Detective Hall. They secured the clothing and returned to the station in the early afternoon. There, following a second reading of the *Miranda* rights, this time by Detective Baston, and another waiver of those rights by the defendant, further questioning ensued. No incriminating statement was taken at that time.

Pursuant to a prior arrangement, the defendant returned to the Old Town police station shortly before 4:00 p.m. on the next day, November 15, 1972. He had already agreed to take a polygraph test, and an appointment had been made with Penobscot County Deputy Sheriff Crosman, a trained polygraph examiner. Arriving at the station, the defendant was met by Detective Ames. They talked for a while about matters unrelated to the double homicide and then walked to an adjacent building where Crosman and Detective Baston were waiting. Crosman immediately identified himself as a polygraph examiner retained by the Attorney General's office. He told the defendant that he was a suspect in the Grounder-Pearson murders, that he would be asked about his involvement in those murders, and that the truthfulness of his answers would be evaluated by the polygraph machine. Before proceeding any further, Crosman read the defendant his *Mi-*

*randa* rights and obtained a waiver.[2] He also informed him that the test was entirely voluntary and that he could refuse to proceed with it at any time. After asking a number of biographical questions, Crosman inquired as to the defendant's involvement with the homicides, eliciting no incriminating statements. Next, Crosman had the defendant listen to a thirty-five minute tape which explained in detail how the polygraph machine works. During this period, the defendant was provided with food and drink as he had requested.

At the end of the taped briefing, Crosman discussed the case with the defendant and again asked him if he desired to submit to the test. Receiving an affirmative response, Crosman provided the defendant with a polygraph examination consent form. Inter alia, the text of the form, which Crosman read aloud to the defendant, reiterated the *Miranda* warnings and reemphasized that the defendant had the right at any time to cut off the questioning and so terminate the examination. The form also contained language waiving the *Miranda* rights and the right to refuse polygraph testing. The defendant signed the statement.[3]

At approximately 6:30 p.m., Crosman began the testing procedure which lasted roughly one hour. After taking a "few minutes" to evaluate the results, Crosman informed the defendant that in his opinion the defendant was lying when he denied involvement in the Grounder-Pearson homicides. After a discussion lasting "ten or fifteen minutes," the defendant for the first time admitted that he had had a hand in the killings. Responding to Crosman's inquiry, the defendant indicated a willingness to discuss his actions with Detectives Ames and Baston.

At approximately 8:00 p.m., Crosman left the room briefly to inform the detectives that the defendant had admitted involvement in the homicides and had agreed to be

---

**2.** Reading the standard *Miranda* warnings from a card, Crosman stated:

"I am a law enforcement officer. I caution you that you have an absolute right to remain silent, that anything you do say can and will be used in a Court of Law against you; that you have the right of the advice of a lawyer before and the presence of a lawyer here with you during questioning, and that if you cannot afford a lawyer, one will be furnished you free *before any questioning*, if you desire."

After reading this warning I asked Mr. Ruybal the following questions: "Do you understand each of these rights I have explained to you?" He answered affirmatively. "Having these rights in mind, do you wish to talk to us now without having a lawyer present?" And he answered this request affirmatively. (emphasis supplied).

Although Crosman began the interview by telling the defendant that the purpose of their meeting was to have him take a polygraph test, Crosman never gave the impression that the *Miranda* warnings were applicable only in the context of the polygraph examination.

**3.** Pertinent portions of the form read as follows:

I have been informed by Richard J. Crosman that he is a Polygraph Examiner for the Department of the Attorney General and that he wants to question me about the murder of Rosemarie PEARSON and William GROUNDER of which I am suspected.

I have also been informed by Richard J. Crosman in the presence of the witness(es) whose signature(s) will appear on page 2 of this Statement of Consent, and I fully understand that:

1. I have the absolute right to remain silent.
2. That anything I say can and will be used in a court of law against me.
3. That I have the right of the advise [sic] of a lawyer *before* being questioned, and that I have the right to have a lawyer here with me during questioning and to observe this polygraph examination.
4. That if I cannot afford a lawyer, one will be furnished me *free* before any questioning or the conduct of this polygraph examination if I desire.

It has further been explained to me that I cannot be required to take this polygraph examination without my consent, and I further understand that I may stop answering questions and terminate (stop) this interview and polygraph examination at any time without prejudice.

I *do not* want to talk or consult with a lawyer prior to further questioning and the conduct of this polygraph examination.

I *do not* desire to have a lawyer present during questioning and the course of this polygraph examination. (emphasis in original).

The form was signed by Crosman and the defendant and witnessed by Baston who also signed the form.

interviewed by them.[4] The three then reentered the room and began questioning the defendant. By 10:30 p.m., the defendant had fully disclosed his participation in the crime and had signed a written confession, an incriminating excerpt of which was quoted above. It is undisputed that during the afternoon and evening of November 15 the defendant never made a request for an attorney, never asked that the testing be discontinued, and never asked that the interrogation cease.

## I

### The Confession

Following the mandate of *State v. Collins,* Me., 297 A.2d 620, 636 (1972), the presiding Justice held an independent evidentiary hearing to test the admissibility of the defendant's confession. Applying the "reasonable doubt" standard also developed in *Collins,* the presiding Justice found that the incriminating oral and written statements made by the defendant on the evening of November 15, 1972 were "made voluntarily, after due and proper warning to the Defendant of his rights, and after a voluntary and knowledgeable waiver by the Defendant of those rights." He further found that "complete '*Miranda*' warnings were given to the defendant before the making of either statement," citing the two warnings by the Assistant County Attorney and Baston on November 14 and the 4:00 p.m. November 15 warning by Crosman. Finally, the presiding Justice found that "[f]ollowing each warning Defendant specifically waived his rights and stated that he did not want an attorney and that he was willing to talk with the officers."

The parties do not seriously dispute the validity of these findings; the defendant, however, contends that he should have been reread his *Miranda* rights subsequent to his first admission of guilt to Crosman and just prior to the crucial interrogation by Ames, Baston, and Crosman that led to the oral and written confessions. The State, on the other hand, argues that for *Miranda* purposes the activities during the afternoon and evening of November 15 constitute one unified interrogation session. The State asserts alternatively that even if a break in the questioning can be said to have occurred, the carry-over effect of the prior warnings was sufficient to protect the defendant's rights under *Miranda.*

In *State v. Myers,* Me., 345 A.2d 500 (1975), we rejected a per-se approach to *Miranda* problems akin to the one presented here explaining that a " 'confession is not necessarily invalid because the "*Miranda*" warning is not repeated in full each time the interrogation process is resumed after an interruption.' " *Id.* at 502, *quoting Miller v. United States,* 396 F.2d 492, 496 (8th Cir. 1968), *cert. denied,* 393 U.S. 1031, 89 S.Ct. 643, 21 L.Ed.2d 574 (1969). *See also State v. Peterson,* Me., 366 A.2d 525, 528 (1976). We further emphasized that in such a case "the ultimate question is, did the defendant with full knowledge of his legal rights knowingly and intentionally relinquish them?" *Myers, supra* at 502, *quoting Miller, supra* at 496. Finally, we enumerated five factors to be considered in evaluating the carry-over effect of *Miranda* warnings given prior to an interruption in the interrogation process:

"(1) the time lapse between the last *Miranda* warnings and the accused's statements;

"(2) interruptions in the continuity of the interrogation;

"(3) whether there was a change of location between the place where the last *Miranda* warnings were given and the place where the accused's statement was made;

"(4) whether the same officer who gave the warnings also conducted the interrogation resulting in the accused's statement; and

"(5) whether the statement elicited during the complained of interrogation dif-

---

4. Detective Ames had left the room a short while after his arrival with the defendant. Detective Baston left the room at about 6:30 p.m., just after the defendant had signed the polygraph consent form.

fered significantly from other statements which had been preceded by *Miranda* warnings." *Id.* at 502, *quoting Commonwealth v. Wideman,* [460 Pa. 699, 707, 334 A.2d 594, 598 (1975)].

Reviewing the record in the light of these five indicia, we observe that

(1) the defendant's first incriminating admission was made only four hours after he had been given general *Miranda* warnings and about one and one-half hours after he had been given the *Miranda* warnings in connection with the polygraph examination;[5]

(2) the interrogation was halted only briefly at around 8:00 p.m. when Crosman left the room to summon Ames and Baston;

(3) no change in location took place;

(4) two of the three officers participating in the final interrogation had given the defendant *Miranda* warnings: Crosman at 4:00 p.m. and at around 6:30 p.m. and Baston at 2:00 p.m. on the day prior to the confession; and

(5) the defendant had already admitted his involvement in the crime to Deputy Crosman prior to Crosman's leaving the room to fetch Ames and Baston. The statements made thereafter to Ames, Baston, and Crosman were consistent with the admission made to Crosman (after adequate warnings) at the end of the polygraph test.

After analyzing the record with reference to these five indicia, we conclude that the prophylactic strictures of *Miranda* were fully satisfied and that the presiding Justice correctly admitted the defendant's incriminating statements into evidence.

The defendant argues that the four *Miranda* warnings he was given prior to his confession were framed in such a way as to give him the impression that the rights specified in the warnings were limited in scope, that is, effective only for the purpose of the interview which immediately followed the warnings. We have studied with care the testimony concerning the four warnings. The warnings were general in nature and sufficient to put an individual of average intelligence and awareness on notice that *any* incriminating statement made at *any* time to law enforcement officers could be used to incriminate him. The defendant was fully and repeatedly informed of his rights, and the officers present at the November 15 interview fully disclosed their status as law enforcement personnel. Furthermore, prior to the polygraph examination, Deputy Crosman, who displayed an unusual degree of professionalism and sensitivity to the rights of accused individuals, carefully informed the defendant that he was a target of their investigation before reading him his *Miranda* rights.[6] Under the totality of the circumstances, we find that the warnings given were sufficient and that the incriminating statements made by the defendant followed a knowing and voluntary waiver of his fifth and sixth amendment rights.

## II

### The Search Warrant

Acting upon an affidavit sworn to by Detective Ames, a complaint justice issued, and the State executed, a warrant authorizing the State to seize ten body hairs from the defendant's upper torso and ten from his pubic zone. Prior to trial, the defendant, pursuant to M.R.Crim.P. 41(e), moved to suppress the evidence obtained under the authority granted by the warrant claiming that Ames' affidavit failed to supply probable cause sufficient to justify the issuance of the warrant. After an independent evidentiary hearing, the presiding Justice denied the motion and admitted the evidence

---

**5.** In *State v. Peterson, supra* at 528, we held that an interval of three hours between warnings and confession did not automatically render the warnings ineffective.

**6.** *See* note 2 *supra.* The polygraph consent form, which was read aloud to the defendant prior to his taking the test, served as a reminder of Crosman's earlier oral warning that defendant was suspected of having committed the Pearson-Grounder homicides. *See* note 3 *supra.*

at trial. The defendant now assigns as error the denial of that motion and renews his claim that Ames' affidavit was deficient.

██ The precepts governing our review of affidavits challenged as failing to supply probable cause may be briefly recapitulated. First of all, in searching for probable cause, we are limited to the four corners of the affidavit. *State v. Smith,* Me., 381 A.2d 1117, 1120 (1978); *State v. Loder,* Me., 381 A.2d 290, 292–93 (1978); *State v. Fernald,* Me., 381 A.2d 282, 286 n.9 (1978); *State v. Gamage,* Me., 340 A.2d 1, 15 (1975); M.R.Crim.P. 41(c). Second, the allegations set forth in the affidavit must be sufficient to warrant a reasonable belief that a crime has been committed, *State v. Loder, supra* at 292, and, in a case such as this, that the evidence sought consists of "non-testimonial evidence which will aid in a particular apprehension or conviction." M.R.Crim.P. 41(b)(4). Third, the affidavit must allege facts and not mere conclusions. *State v. Loder, supra* at 293; *State v. Willey,* Me., 363 A.2d 739, 741 (1976). Finally, although the affiant is permitted to make use of hearsay, the affidavit must set forth circumstances indicating the reliability of the hearsay. *State v. Loder, supra* at 293.

██ Reduced to its essentials, Ames' affidavit stated as follows:

(1) The body of the defendant's mother-in-law was discovered in a pool of blood in her home.

(2) Shortly after the body had been discovered, a licensed physician performed a benzidine blood test on the defendant's hand, and Ames observed that the test was positive.

(3) Ames attended Pearson's autopsy and was informed by Dr. Eyerer, who presided at the autopsy, that Pearson had died of "strangulation secondary to stab wounds."

(4) Ames forwarded to the F.B.I. laboratories in Washington a loose hair found on Pearson's body during the autopsy, the bottom sheet taken from her bed on the morning of the killing, and Pearson's nightcap. A letter from the F.B.I. stated that the hair, and others found on the sheet and nightcap, "appear to have originated from an area near the pubic region and are suitable for comparison purposes . . . ." The F.B.I. also concluded that it was unlikely that the hairs came from the deceased, Rose Pearson.

(5) The defendant had given a statement to Ames (quoted in part above) indicating that he had had sexual relations with Pearson on the morning of her death, that he had chased Pearson, and that he remembered seeing her lying on her side as he left the house.

(6) Ames was present at a probable cause hearing where the defendant was bound over to the Grand Jury. He was later informed by an Assistant Attorney General that the defendant had been indicted for the murder of Pearson.

The defendant's main argument, grounded on M.R.Crim.P. 41(b), holds that the affidavit fails to demonstrate how the seizure of the hairs would help secure a particular apprehension or conviction. We disagree. The affidavit alleged that the defendant had admitted having sexual relations with the deceased in her bed on the morning of her death. It also alleged that the defendant had admitted chasing and struggling with the deceased and that she was lying on the floor when last he saw her. The complaint justice was also informed that the defendant had been indicted for the murder of Pearson. Rudimentary common sense, which we have held to be available in reviewing probable cause affidavits, *State v. Hawkins,* Me., 261 A.2d 255, 259 (1970), *citing United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), leads us, as it must have led the complaint justice, to the conclusion that seizure of the defendant's body hairs would most likely aid in a particular conviction, namely that of the defendant. Since, according to the F.B.I., the hairs found on Pearson's body, sheet, and nightcap were not her own, there existed a strong possibility that they derived from Pearson's assailant. In light of the defendant's admissions, it was very possible that a comparison of the hairs found

on the scene with those seized from the defendant would indicate that the hairs had a common source—the defendant. A positive F.B.I. report would supply an important piece of circumstantial evidence which would serve independently to corroborate the defendant's incriminating statements. Thus, the affidavit clearly revealed a "nexus . . . between the item[s] to be seized and criminal behavior," *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967), and, further, provided the complaint justice with probable cause to believe that seizure of the hairs would aid in the conviction of the defendant, who had already been indicted for the crime.

We have considered the other arguments addressed to us on this issue by the defendant and deem them to be unmeritorious. We resolve these points, as well as the ones we have discussed, against the defendant.

### III

#### The Proposed Instruction

■ Prior to the presiding Justice's charge to the jury, the defendant submitted a proposed instruction that would have informed the jury of the penal consequences, or lack thereof, of a verdict of not guilty by reason of mental disease or defect. The defendant now assigns as error the court's refusal to instruct as requested. In doing so, he asks us to reexamine *State v. Dyer,* Me., 371 A.2d 1079 (1977); *State v. Armstrong,* Me., 344 A.2d 42 (1975); *State v. Wallace,* Me., 333 A.2d 72 (1975); and *State v. Park,* 159 Me. 328, 193 A.2d 1 (1963). For the reasons set forth in those cases, we discern no error in the court's refusal to charge as requested.

The entry is:

Appeal denied.

Judgment affirmed.

WEATHERBEE, J., sat at argument and participated at conference but died prior to the adoption of this opinion.

DUFRESNE, A.R.J., sat at oral argument and participated at conference as Chief Justice but retired prior to the adoption of this opinion. He has joined the opinion as Active Retired Justice.