STATE of Maine

v.

**Dale SWEATT & Carol Sweatt.**

Supreme Judicial Court of Maine.

Argued Jan. 12, 1981.

Decided March 30, 1981.

Janet T. Mills (orally), Dist. Atty., South Paris, for plaintiffs.

Arthur LaFrance, (orally), Portland, Craig E. Turner, South Paris, for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY, NICHOLS, GLASSMAN, ROBERTS and CARTER, JJ.

GODFREY, Justice.

Dale and Carol Sweatt moved in Superior Court for return of certain seized property and for suppression of the use of it as evidence. Although no criminal proceeding was pending against them, the Sweatts moved, pursuant to M.R.Crim.P. 41(e), to obtain return of property taken by the police during searches and seizures that the Sweatts contend were unlawful under the state and federal constitutions.

The State of Maine appeals and the Sweatts cross-appeal from an order of the Superior Court granting in part the Sweatts' motion to suppress. The Superior Court ordered suppression of pieces of tourmaline gem rough and other items seized from the Sweatts' home, from Dale Sweatt's office and bank vault, and from a retail store, known as "The Lamp Post," that sold the Sweatts' gems on consignment. In contrast, the court declined to suppress items taken from a safe which was co-owned by the Sweatts and their attorney and which was located in the attorney's office in which Carol Sweatt worked as a legal secretary.

We affirm that part of the Superior Court's order granting suppression and return of items taken from the Sweatts' home, Dale Sweatt's office and bank vault, and the Lamp Post; we reverse that part of the order denying suppression and return of the items found in the safe.

On October 9, 1980, a District Court judge issued a search warrant authorizing law enforcement officers to search the Sweatts' residence, Dale Sweatt's office and gem cutting room, his attorney's office, and safety deposit boxes leased by him in a specified bank. Four days later the same judge issued a warrant for the search of Dale Sweatt's walk-in vault in the same bank. Under both warrants the police were permitted to search for the following things:

One piece of tourmaline gem rough from the Dunton Mine in Newry, Maine which is approximately two inches in length and four and one-half inches in diameter being a basal termination and readily identifiable as coming from the Dunton Mine in Newry, Maine and being more particularly described as a piece of tourmaline which will match in color, size and striation the piece of tourmaline known as the jolly green giant presently residing at the National Museum of Natural History in Washington D. C. and in addition at least 100 pounds of tourmaline gem rough readily identifiable as being from the Dunton Mine in Newry, Maine and more specifically described as tourmaline either red in color, green in color, or a combination known as watermelon which will have a red center and a green perimeter and as such specifically described tourmalines being unique to the Dunton Mine in Newry, Maine leased to and mined by Plumbago Mining Corporation.

Both warrants incorporated by reference an affidavit by Hubert W. Carter, Jr., a detective with the Maine State Police. The affidavit consisted mostly of information conveyed to Carter by Dean McCrillis, a former partner of Dale Sweatt in the Plumbago Mining Corporation. Carter said in his affidavit that McCrillis had informed him that in May of 1973 three boxes of gem tourmaline disappeared while being transported from the mine to the Plumbago offices; that two named employees of the corporation had told McCrillis that Dale Sweatt had left the mine one day carrying five and one-half boxes of gem tourmaline; that upon his arrival at the corporation office Sweatt had delivered to McCrillis

only two and one-half boxes of gems; that one of those employees who had watched Sweatt leave the mine had told McCrillis that a particular piece of tourmaline the employee wanted to buy was missing from the boxes that arrived; that the other employee, who was entitled to a bonus if the production from the mine increased in 1973, had told McCrillis the output had increased; that since McCrillis was unaware of any increase in production, he concluded that large quantities of gems were somehow vanishing; and that McCrillis had further informed the affiant that a base piece to the "Jolly Green Giant" tourmaline crystal had not been seen since December of 1974.[1]

The affidavit went on to relate that once in 1975 and at specified times in 1980 Dale Sweatt had been reported engaging in described efforts to sell large amounts of tourmaline, and that McCrillis said Sweatt had had lawful access to only 12 pounds of Dunton Mine tourmaline, given to him when he left the corporation in 1975. However, the affidavit contained no explanation why Sweatt could not have purchased additional quantities of tourmaline later. An unnamed informant had told Detective Carter that Sweatt was often accompanied by a bodyguard, carried a handgun, referred to himself once as the tourmaline king of the world, and expressed anticipation that a statute of limitations would soon run out.

Attached to the affidavit of Detective Carter was a photograph of the Jolly Green Giant and affidavits by three persons who had observed Sweatt's attempts to sell tourmaline. There was no affidavit by McCrillis himself.

From the inventories of the items seized pursuant to the warrants, it appears that the police never found the putative missing piece of the base of the Jolly Green Giant. In addition to tourmaline gem rough, the searching officers seized finished stones, money, rings, gold pieces, jewelry pins, cuff links, earrings, a social security card, two deeds, empty envelopes and plastic bags, correspondence, and an attaché case.

Nearly three weeks after the searches made pursuant to the warrants were completed, police conducted a warrantless search of the Lamp Post, a shop in Rumford located in the same building as the offices of Dale Sweatt and his attorney, which sold women's apparel and jewelry. During the summer of 1980 Dean McCrillis had told Detective Carter that the Lamp Post carried a large display of Maine tourmaline jewelry. Detective Carter went to the Lamp Post on November 4, 1980, and asked who owned the tourmaline jewelry that was offered for sale. Learning from the sales clerk that the jewelry was on consignment from the Sweatts, Carter remained in the store and spoke with the Maine attorney general's office for about an hour. When Dale Sweatt and his attorney arrived at the Lamp Post and asked Detective Carter to leave, Carter seized the jewelry from the glass display cases. All the items taken were finished tourmaline jewelry.

On November 7, 1980, Dale and Carol Sweatt filed in Superior Court a motion for the return of the seized items and suppression of their use as evidence. The Sweatts alleged that the searches violated their right, guaranteed by article I, section 5, of the Maine Constitution and the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures. Among other grounds for the motion, the Sweatts alleged that the tourmaline that could be seized under the warrant was not identifiable except by experts whom the warrant did not require to be present during the searches and seizures; that the supporting affidavits contained statements by hearsay declarants whose credibility was unknown; that the affidavit gave no indication why the Sweatts could not have obtained the seized tourmaline legally and further offered no guidance on

---

1. The larger crystal known as the Jolly Green Giant had been discovered in the Dunton Mine in October, 1972, and donated to the Smithsonian Institution in Washington, D. C., as a specimen for the National Museum of Natural History. According to Carter's affidavit, McCrillis said that one of the four base pieces of the Jolly Green Giant had been and still remained missing as of the time of the affidavit.

how to distinguish stolen tourmaline from legal tourmaline; and that the warrantless search of the retail store was made without probable cause and in circumstances where the necessity of a warrant was not obviated.

Following a suppression hearing the presiding justice issued a thirty-page order concerning the Sweatts' motion. Addressing the threshold issue of standing, he ruled that the Sweatts had standing to suppress the evidence only if they had a reasonable expectation of privacy in the several areas searched and a possessory interest in the items seized. Although the Sweatts' standing was clear with respect to the search of the Sweatts' home and Dale Sweatt's office and bank vault, the searches of their attorney's office and of the Lamp Post presented more difficult questions. The justice found that the Sweatts had a legitimate expectation of privacy in the attorney's office where Carol Sweatt worked and in the safe that was searched there, but he denied standing as to that search because there was no evidence that the Sweatts owned any of the objects seized there; namely, rough cut tourmaline stones, a note, and a letter with the heading "Crystal Earth, Inc." Finding that the movants had no legitimate expectation of privacy in the Lamp Post, the justice nevertheless recognized standing on the ground that the Sweatts owned all the items taken from the store.

The justice next considered whether the description of the tourmaline to be seized, which was identical in both warrants, was sufficiently specific. He concluded that the warrants lacked information sufficient to enable a police officer to determine which tourmaline was from the Dunton Mine or to identify tourmaline gems and gem rough that Dale Sweatt had unlawfully taken, according to the affidavit. Although the affidavit alleged that the geographic origin of the tourmaline could be determined by an expert, the warrant did not require an expert to be present during the searches. Furthermore, the affidavit did not state why any or all of the tourmaline to be searched for in the areas specified could not have been obtained legally.

Turning to the question whether the affidavit supported probable cause for the searches, the presiding justice first ruled that the information was not unduly stale: if one assumed the credibility of all the information in the affidavit, one could infer that Dale Sweatt had been attempting to sell Maine tourmaline in the recent past. The justice found that if the Sweatts had acquired the tourmaline unlawfully, the District Judge would have probable cause to believe that they still retained it.

However, he found that the affidavits did not create probable cause to believe that the Sweatts had acquired any of their tourmaline unlawfully. As to any unlawful taking, Detective Carter had no personal knowledge but relied entirely on double hearsay by declarants whose credibility was unknown. Since there was no reliable evidence that the Sweatts had unlawfully taken any tourmaline, there could be no probable cause to believe that they possessed or were attempting to sell stolen property.

Finally, the justice ruled that the warrantless search and seizure at the Lamp Post violated the Fourth Amendment to the United States Constitution. Detective Carter had testified that he knew tourmaline was being sold at the store months before he conducted the search. The fact that he remained at the store for an hour and engaged in a conversation which ultimately became heated did not create exigent circumstances excusing him from seeking a search warrant.

Because there was no probable cause to believe that the seized tourmaline was contraband or stolen property, the justice ordered the property returned to the Sweatts except the items taken from their safe in their attorney's office.

## 1.

### Standing

The Sweatts challenge the presiding justice's ruling that they lacked standing to suppress the items seized from the safe in their attorney's office; the state attacks his

decision that the Sweatts had standing to object to the warrantless search at the Lamp Post. In the Sweatts' view a possessory interest in the goods seized, though relevant to standing, is not a requisite for standing, and hence the finding that they had a reasonable expectation of privacy in the safe should have sufficed to support their standing with respect to things in the safe that the police seized. The State contends that a possessory interest in the items seized may contribute to, but is not sufficient for, standing, and hence the justice's conclusion that the Sweatts had no legitimate expectation of privacy in the Lamp Post should have foreclosed the possibility of standing to object to seizure of their jewelry in the store.

Since *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the focus of judicial inquiry into standing to suppress illegally seized evidence has shifted from an analysis of the movant's possessory interests to a determination of whether the movant had "a legitimate expectation of privacy" in the invaded place. Two recent cases, *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), and *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 533 (1980), make clear that ownership of the seized goods is only one factor to be considered in determining whether there is a legitimate expectation of privacy; possessory rights alone do not *per se* create the necessary expectation, and the absence of an assertion of such rights does not *per se* defeat the expectation.

█ In the present case, the presiding justice found as a fact that Dale Sweatt, Carol Sweatt, and their attorney were co-owners of the safe in the Sweatts' attorney's office and that Carol Sweatt worked as a legal secretary in that office. At the suppression hearing, the movants presented evidence that Carol Sweatt was present during the search, that Dale Sweatt owned the building in which the attorney's office was located, that the attorney leased his office space from Dale Sweatt, and that Dale Sweatt's office and the attorney's office were connected by a small sliding partition.

█ Even if the Sweatts were not the owners of any of the items kept in the safe, they were at least co-bailees of such items, with consequent responsibility for their safekeeping and ultimate return to the owners. In such circumstances, it could not be correct to hold that the Sweatts had no legitimate expectation of privacy with respect to the safe and its contents. *See Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 154 (1968); *United States v. Lefkowitz*, 464 F.Supp. 227 (C.D.Cal. 1979), *aff'd*, 618 F.2d 1313 (1980); *People v. Davis*, 86 Ill.App.3d 557, 41 Ill.Dec. 611, 407 N.E.2d 1109 (1980); *State v. Williams*, 168 N.J.Super. 359, 403 A.2d 31 (1979), *aff'd*, 84 N.J. 217, 417 A.2d 1046 (1980).[2] The fact that the safe was not locked at the time of the search and seizure did not have the effect of negating that expectation or rendering it unreasonable or illegitimate. Secrecy is not a requisite for the legitimate expectation of privacy.

█ In ruling that the movants had standing to object to the seizure of their jewelry in the Lamp Post, the justice appears to have believed that under article I, section 5, of the Maine Constitution a reasonable expectation of privacy is unnecessary to support standing and that an alternative sufficient ground for standing is a property interest in the seized goods. This Court has never interpreted the Maine Constitution differently from the United States Constitution on the issue of standing to bring a motion to suppress. As the Superior Court recognized, property interests alone may be insufficient to support standing under the the Fourth Amendment. *See United States v. Salvucci, supra.*

---

2. *Cf. United States v. Torch*, 609 F.2d 1088 (4th Cir. 1979) (employee lacked standing to suppress evidence seized from his employer's warehouse in a case where the employee was absent during the search, had no financial interest in the employer company or in the premises, had no area of the warehouse set aside for his own use, and had no right to exclude persons from the premises).

The Superior Court concluded that the movants had no legitimate expectation of privacy with respect to their tourmaline gems in the Lamp Post because the store was open for regular business hours and the seized gems were openly displayed for sale. Certainly with respect to the *seizure* of the jewelry, that conclusion is not supportable on the facts of this case. It is uncontroverted that the gems seized from the Lamp Post were owned by the Sweatts and had been consigned to the store for sale to the public. The tourmaline jewelry was placed inside glass display cases where it could be seen but not touched by customers of the store. No visitor to the store was expected to carry away the jewelry without paying for it. The Sweatts' expectation that their gems would not be taken except after purchase by customers was not affected by the fact that in this instance the takers were police officers. *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979).

The United States Supreme Court has steadily adhered to the position that the privacy interest protected by the Fourth Amendment is privacy from intrusion by agents of government, *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387, 401 (1978), and it has never repudiated its conclusion in *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), that the Fourth Amendment protects people, not places. Thus, the fact that the Sweatts understood or even desired that members of the general public would enter the Lamp Post and look at the tourmaline gems in the display cases was not inconsistent with the normal legitimate expectation of an owner of jewelry delivered to a retail store on consignment that the jewelry would be removed from the display cases only under limited circumstances. In

*Lo-Ji Sales, Inc. v. New York, supra*, 442 U.S. at 329, 99 S.Ct. at 2326, Chief Justice Burger, speaking for a unanimous Court, said:

> The suggestion is that by virtue of its display of the items at issue to the general public in areas of its store open to them, petitioner had no legitimate expectation of privacy against governmental intrusion, see *Rakas v. Illinois*, 439 U.S. 128 [99 S.Ct. 421, 58 L.Ed.2d 387] (1978), and that accordingly no warrant was needed. But there is no basis for the notion that because a retail store invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees. See *Lewis v. United States*, 385 U.S. 206, 211 [87 S.Ct. 424, 427, 17 L.Ed.2d 312] (1966). The Town Justice viewed the films, not as a customer, but without the payment a member of the public would be required to make. Similarly, in examining the books and in the manner of viewing the containers in which the films were packaged for sale, he was not seeing them as a customer would ordinarily see them.

A person who invites one form of intrusion does not thereby lose standing to object to every form of invasion of his privacy. By itself, Detective Carter's non-intrusive plain view of the jewelry in the store established only the lawfulness of the observation itself, not the lawfulness of his subsequent seizure of the gems. *Coolidge v. New Hampshire*, 403 U.S. 443, 468, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971).[3] Merely by acceding to the display of the gems to possible purchasers by the store owner, the Sweatts did not surrender their interest in Fourth Amendment protection from unreasonable *seizure* of the gems by agents of the government.[4] Accordingly,

3. The limits on the doctrine are implicit in the statement of its rationale. The first of these is that plain view *alone* is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'

*Coolidge v. New Hampshire*, 403 U.S. 443, 468, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971).

4. *See* 1 W. LaFave, *Search and Seizure* § 2.2 (1978). *See also* Moylan, *The Plain View Doctrine: Unexpected Child of the Great "Search Incident" Geography Battle*, 26 Mercer L.Rev. 1047, 1096 (1975):

there was no legal basis for the Superior Court to conclude that the Sweatts, just by permitting display of their tourmaline gems for sale at the Lamp Post, surrendered their legitimate expectation that government agents would not meddle with their property except in conformity with the Fourth Amendment. The movants had standing to move for the suppression of jewelry seized from the Lamp Post.[5]

### 2.

### *Probable Cause*

■ Both the search warrants in question incorporated by reference an affidavit by Detective Carter. From the face of the affidavit it was apparent that Carter did not assert any personal knowledge of the facts surrounding the alleged unlawful taking of tourmaline, and all the information supposedly tending to show probable cause to believe that criminal activity had occurred sometime during the years 1973 to 1975 was derived from hearsay. Carter's affidavit relies heavily on hearsay statements of Dean McCrillis and statements of two employees of the corporation—as reported through McCrillis and thus double hearsay—concerning alleged disappearance of tourmaline gem rough in 1973. The affidavit said also that McCrillis reported that the curator of the New York Museum of Natural History had called him in March of 1975 to report that Dale Sweatt had visited the curator at his office in New York, bringing with him fifty pounds of tourmaline gem rough in a box and asking for assistance in the selling of tourmaline.

Carter's affidavit states no specific circumstances from which a reviewing magistrate could independently judge the reliability of what the primary hearsay declarant is alleged to have said—let alone that of the persons on whose alleged statements the hearsay declarant himself is said to have relied. Moreover, the affidavit as a whole states no facts from which the magistrate could assess the reliability of the information provided in it regarding events from 1973 to 1975. It was from information about alleged events in those years that Carter's affidavit purported to establish probable cause to believe that the Sweatts engaged in criminal activity with regard to the tourmaline. Without some basis for assessing the reliability of the hearsay information presented, the affidavit did not

---

Seeing something in open view does not, of course, dispose, ipso facto, of the problem of crossing constitutionally protected thresholds. Those who thoughtlessly over-apply the plain view doctrine to every situation where there is a visual open view have not yet learned the simple lesson long since mastered by old hands at the burlesque houses, 'You can't touch everything you can see.'

Light waves cross thresholds with a constitutional impunity not permitted arms and legs. Wherever the eye may go, the body of the policeman may not necessarily follow.

5. We have analyzed issues of the Sweatts' right to invoke the Fourth Amendment in terms of "standing." The following passage in 3 W. LaFave, *Search and Seizure* § 11.3 (Supp.1980 at 57), is pertinent:

In the recent case of *Rakas v. Illinois*, the Court asked 'whether it serves any useful analytical purpose to consider [the principle that Fourth Amendment rights are personal rights] a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim.' The Court, per Rehnquist, J., then proceeded to answer that inquiry in the negative, concluding that 'the better analysis forthrightly focuses on the extent of a partic-ular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.' This may be so at least in the sense that the expectation-of-privacy analysis utilized with respect to so-called standing issues is also used for other purposes, most notably to determine whether any search for Fourth Amendment purposes has occurred. Yet, it is important to keep in mind that the question traditionally labelled as standing (did the police intrude upon *this defendant's* justified expectation of privacy?) is not identical to, for example, the question of whether any Fourth Amendment search has occurred (did the police intrude upon *anyone's* justified expectation of privacy?), and that therefore the particular issues discussed herein are still rather discrete and deserving of separate attention, no matter what label is put on them. As was conceded in *Rakas*, it cannot be said 'that by dispensing with the rubric of standing ... we have rendered any simpler the determination of whether the proponent of a motion to suppress is entitled to contest the legality of a search and seizure.'

establish probable cause to believe that criminal activity occurred during those years, and without probable cause the warrants must fail because they relied on Carter's affidavit.

The state argues that credibility of the hearsay declarant is in issue only if he is an unknown informant or an associate of criminals; that a declarant who is known to the affiant and has had no involvement in criminality need not be shown to be reliable. It is true that the burden of establishing a hearsay declarant's credibility may vary according to the nature of the declarant. When a hearsay declarant is unknown to the affiant or is known to associate with criminals, the affidavit must make a more elaborate showing of credibility than when the declarant is a disinterested observer. However, we cannot adopt the state's position that some weighing of the declarant's credibility is ever unnecessary. This Court has consistently held that if the affidavit supporting a search warrant relies on hearsay information, the affidavit must set forth circumstances indicating the reliability of the hearsay. E. g., State v. Ruybal, Me., 398 A.2d 407, 414 (1979). Although one court has said it would generally accord a presumption of reliability to the hearsay declaration of an eyewitness who was an identified bystander or a victim of a crime, United States v. Burke, 517 F.2d 377, 380 n. 2 (2nd Cir. 1975), that court did not suggest that credibility need not be shown even in such cases when circumstances make application of the presumption inappropriate.

In the present case, even if the Burke standard were to be applied, the affidavit was required to show affirmatively that the hearsay information concerning the alleged unlawful taking was reliable. Detective Carter relied heavily on the unsworn statements of McCrillis in attempting to show probable cause to believe that sometime between 1973 and 1975 the Sweatts had unlawfully acquired some unspecified amount of tourmaline gem rough. McCrillis hardly qualified as a disinterested observer, having been a former associate of Dale Sweatt in the mining corporation that produced the tourmaline. The affidavit itself shows that relations between McCrillis and Sweatt were far from cordial. It shows also that McCrillis had no direct personal knowledge that any tourmaline had disappeared but inferred the loss as a result of statements made by two employees of the mining corporation. Those informants in turn were not disinterested: one was said to be an employee who had professed a desire to purchase a particular piece of tourmaline rough that disappeared; the other was said to be an employee who was entitled to more money if the production of the mine increased and hence had an incentive to exaggerate the amount of tourmaline he produced. All that McCrillis could report to Detective Carter is that he had received less tourmaline than his employees thought he should and that Dale Sweatt was supposed to be in charge of the tourmaline when it disappeared.

Although, to judge from Carter's affidavit, McCrillis was the person most likely to know about the alleged disappearance of tourmaline, McCrillis never submitted an affidavit concerning the alleged taking. In the absence of corroboration of the hearsay and double hearsay in Carter's affidavit,[6] the Superior Court correctly concluded that the information in Carter's affidavit was not sufficiently reliable to support probable cause to believe that a crime had been committed.

### 3.

### The Description in the Warrants of the Items to be Seized

Both warrants authorized a search for the putative missing piece of the base of

6. The state places great reliance on statements by an unnamed informant that Dale Sweatt was often accompanied by a bodyguard, carried a pistol, and had expressed relief that a statute of limitations would soon expire. Nowhere in the affidavit is it stated that this informant had proved himself reliable to the affiant. The reported actions by Dale Sweatt are as consistent with a concern by a gem dealer to prevent robbery and avoid civil litigation as with an attempt by an embezzler to escape criminal liability.

the Jolly Green Giant and one hundred pounds of tourmaline gem rough "readily identifiable as being from the Dunton Mine in Newry, Maine" and having certain described coloration. The supporting affidavit stated that certain named experts, including Dean McCrillis, could identify tourmaline from the Dunton Mine at Newry, Maine. However, the search warrant did not require any of those experts to be present at the search. According to the affidavit, McCrillis had stated that none of the owners of the original mining company in 1972 had any personal right "to have or possess Maine tourmaline," but stated further that Dale Sweatt had received ten to twelve pounds of tourmaline in January, 1975, under the agreement by which he sold his interest in the mining corporation. There was nothing in the affidavit to explain why Sweatt could not have purchased or otherwise lawfully acquired more Maine tourmaline after 1975. The affidavit provided no basis for distinguishing unlawfully acquired tourmaline from tourmaline legally obtained. The Superior Court ruled that the description of the items that could properly be seized was unconstitutionally vague.

The state contends that the description in the search warrant, although generic, was as specific as possible in the circumstances. Inferring from Carter's affidavit that the Sweatts could legally possess only twelve pounds of tourmaline from the Dunton Mine, and arguing that the description of Dunton Mine tourmaline in the warrants was sufficient because that kind of tourmaline is unique and readily identifiable by the experts named in the affidavit, the state argues that the police could properly seize any Dunton Mine tourmaline in excess of that amount. We disagree.

▮ A search warrant must describe the items to be seized with a particularity that will enable the searching police officer to identify them with certainty. Such particularity discourages general searches and prevents the unauthorized seizure of property under the mistaken belief that it falls within the authorization of the warrant. *State v. Corbin*, Me., 419 A.2d 362, 363

(1980). The seizable property must be identifiable before seizure; the warrant may not provide for a post-seizure determination of what items were properly taken. *See, e. g., Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); *United States v. Abrams*, 615 F.2d 541 (1st Cir. 1980); *United States v. Klein*, 565 F.2d 183 (1st Cir. 1977). Generic descriptions are permissible only when the affidavits establish that any of the generically described goods found at the searched premises "were likely to have been stolen and constituted a ·dominant part of the goods on the premises." *United States v. Abrams, supra*, at 545.

Carter's affidavit did not show that any tourmaline found at the searched premises was likely to have been stolen. The presiding justice properly rejected any assumption that the Sweatts, dealers in gems, could not have purchased Dunton Mine tourmaline after Dale Sweatt left the mining corporation. Hence, the issue becomes whether, in the circumstances, the description of the tourmaline which could properly be seized was unconstitutionally generic.

▮ We concur in the court's conclusion that, in the circumstances, the search warrants lacked the particularity required by the Fourth Amendment. Although at the suppression hearing Detective Carter testified that he had received some informal training in identifying Dunton Mine tourmaline, that fact appears neither in the affidavit nor in the warrants. Furthermore, the warrants did not require Carter's presence at any search but were rather addressed to "Hubert W. Carter, Jr., an authorized officer of the Maine State Police, or any other authorized police officer." None of the gem experts mentioned in Carter's affidavit were required by the warrants to attend the searches to identify Dunton Mine tourmaline. Even if the affidavit had adequately described Dunton Mine tourmaline gem rough, it still would have offered the police no guidance on how to distinguish the allegedly stolen tourmaline gem rough from any that might have

been acquired legally.[7] Because any stolen tourmaline gem rough could have been identified, if at all, only after the seizure was completed, the warrants' description of the items to be seized was unconstitutionally general.

### 4.

### *Constitutionality of the Warrantless Search of the Lamp Post*

 The judge below found that the warrantless search of the Lamp Post violated the Fourth Amendment to the United States Constitution on the ground that there were no exigent circumstances obviating the procurement of a search warrant. We find it unnecessary to address the issue of exigency because there was no probable cause justifying a warrantless search in any event. The issue of whether exigent circumstances existed becomes relevant only if there has been a threshold finding that there was probable cause for the search. *See, e. g., State v. Barclay,* Me., 398 A.2d 794, 797 (1979). From Carter's own testimony at the suppression hearing, it appears that his basis for believing that the Sweatts' jewelry in the Lamp Post was subject to seizure was that the quantity of Maine tourmaline seized three weeks earlier under the October warrants "far exceeded" the amount that McCrillis had told him Dale Sweatt could legally possess. We have pointed out above, in discussing the description of the items to be seized, the fallacy of assuming that even if it was true that Dale Sweatt could lawfully possess only twelve pounds of Maine tourmaline in 1975, he could not be in lawful possession of more than that amount in 1980. Nothing in McCrillis's narration to Detective Carter served to exclude the obvious possibility that the Sweatts, as gem dealers, could have acquired additional amounts of Maine tourmaline over a period of five years by purchase or other lawful means. The state thus failed to meet its burden of showing that Carter had probable cause to seize the Sweatts' jewelry at the Lamp Post.

### 5.

### *The Motion to Return*

M.R.Crim.P. 41(e) provides that if a motion to suppress is granted, the seized property must be returned to its owner unless it is "otherwise subject to lawful detention." The presiding justice ruled that since the affidavit failed to create probable cause to believe that any of the tourmaline belonging to the Sweatts had been stolen, and the tourmaline was not declared contraband by force of law, the gems were not subject to lawful detention. Consequently, the justice ordered the property seized at every location except from the safe in the attorney's office returned to the Sweatts.

The state contends that the decisions on a motion to suppress and on a motion to return involve separate inquiries. In the state's view, the fact that an affidavit supporting a search warrant fails to show probable cause to believe that the seized items were stolen does not negate every possibility that the goods actually are stolen. According to the state, to return the tourmaline in the circumstances of this case would protect the perpetrators of a crime.

 We agree that whether evidence should be suppressed and whether it should be returned to its owner are distinguishable questions. Where evidence is suppressed because of a violation of the Fourth Amendment but it otherwise appears that the seized goods are contraband, the judge may properly deny a motion to return the evidence. For example, in *United States v. Scott,* 149 F.Supp. 837 (D.D.C.1957), evidence was seized on probable cause but without a warrant in circumstances which did not raise any of the exceptions to the warrant requirement. Because it appeared that the seized items were stolen, the court suppressed the evidence but declined to order it returned to the movant.

 However, the burden is always on the government to show some nexus between the supposed evidence that has

---

7. In fact, to judge from the inventories prepared by the police, the searching officers did not differentiate finished jewelry from the gem rough specified in the warrant.

been suppressed and criminal activity before the supposed evidence may be detained. *See, e. g., United States v. One Residence & Attached Garage*, 603 F.2d 1231 (7th Cir. 1979). Such a nexus would be present where the suppressed evidence, though not contraband *per se*, is shown by the state to be the instrumentality or fruit of a crime. *See, e. g., State v. Rose*, 173 N.J.Super. 478, 414 A.2d 600 (1980). But where the suppressed evidence is neither contraband by force of law nor stolen property nor evidence of a crime, it must be returned to the movant absent an adverse claim of ownership. *United States v. Wright*, 610 F.2d 930 (D.C.Cir.1979); *State v. Smith*, Me., 381 A.2d 1117, 1123 (1978).

■ Although the Superior Court noted several basic deficiencies in the warrants, the affidavit, and the searches themselves, the court's principal conclusion, which we affirm, is that there was no showing of probable cause to believe that any of the seized property had been illegally acquired. The state has never asserted that tourmaline legally possessed by the Sweatts constituted evidence of any crime. Tourmaline is not declared contraband by force of law. Accordingly, there was no basis on which the state could properly detain the seized property, and the presiding justice correctly ordered the return of property seized at the Sweatts' home, at Dale Sweatt's office and bank vault, and at the Lamp Post.

Since the presiding justice was in error in concluding that the Sweatts had no standing to seek suppression and return of the items taken from their safe in their attorney's office, and since there has been no sufficient showing of probable cause to believe that the property in the safe was unlawfully in the Sweatts' possession, and since no third-party claim has been advanced, the Superior Court should have forthwith granted the motion for suppression and return of that property also.

The entry is:

Appeal by the state denied.

Cross-appeal by the movants sustained.

Judgment affirmed in part and reversed in part.

Remanded for entry of an order suppressing all property seized and directing its prompt return to the movants.

McKUSICK, C. J., and WERNICK, NICHOLS and ROBERTS, JJ., concurring.

CARTER, J., with whom GLASSMAN, J., joins, concurring in a separate opinion.

CARTER, Justice, with whom GLASSMAN, Justice, joins, concurring.

I concur in the result reached by the majority opinion and also with the reasoning of the court on all issues save that of the question of defendants' standing to challenge the seizure of their tourmaline from the store known as the Lamp Post. On that issue, though I concur in the result reached by the majority, I believe that the broad concept of "a reasonable expectation of privacy" as articulated in *Lo-Ji Sales, Inc. v. New York*, 422 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 and *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) is not a necessary foundation, on the facts of this case, to the conclusion that defendants have standing to object to the seizure of gems at the Lamp Post.

In the circumstances of this case, standing to challenge *the seizure* of the gems while on public display does not depend upon any "expectation of privacy" in the broad sense discussed in *Rakas*. If it did, defendants' claim of standing must surely fail in this case. Clearly, here there was no "expectation of privacy" as those words are used in *Rakas*, because the stones were put out in cases for the public to see. What was present was an expectation that no one would remove the stones and carry them away in violation of the defendants' proprietary interest in them. Therefore, so far as the defendants object to Officer Carter's visual observation of the gems in their display case (the search), they are without standing because they did not expect, did

not, indeed, seek or desire, privacy so far as observation of the stones is concerned.[1]

So far as their objection to the warrantless entry of the officer into the case in which the gems were displayed and their subsequent *seizure* and removal from the premises is concerned, all that is required as a factual predicate for defendants' standing to object to that conduct is their claim of ownership of the gems. The seizure of the stones is a *per se* violation of their property interest in the gems. There is no need to find in any broader sense "a reasonable expectation of privacy" in order to determine that standing exists to challenge the seizure of the gems because the intrusion upon the property rights of the defendants in the gems arising from their ownership of them, gives them sufficient interest in the legality *of the seizure* to permit them to challenge it.

Thus, it is not necessary to attempt to artfully construct, as does the majority, some reasonable expectation on the part of the defendants to "privacy" in order to determine that they have a legitimate interest in objecting to the use of the gems as evidence against them. That cannot be successfully done in any event, because where items are put on public display for the very purpose of being seen by the public, there cannot be an expectation of privacy, as such, sufficient to support a finding of standing in the exhibitor. In fact, the majority opinion actually finds here and classifies under the rubric of "a reasonable expectation of privacy" an expectation that "No visitor to the store ... [would] carry away the jewelry without paying for it." That is not the broad, amorphous "expectation of privacy" conceptualized in *Rakas*. That is an expectation of respect for one's property rights stemming from ownership. That expectation is only a sometime component of the broader concept put forth in *Rakas*. It will not support standing to challenge the legality of a search where the property is held under circumstances showing that no privacy is expected. However,

by definition, a seizure of property, not contraband, even if placed upon public inspection, intrudes upon the ownership rights of the exhibitor. Where the challenge is to *the seizure* of the property, a claim of property interest therein is, by itself, sufficient to confer standing on one asserting the challenge.

The concept that one has standing to object to seizure of his own property simply because of his proprietary interest in it is made explicit in *Rakas v. Illinois, supra.* There, the court specifically points out that though a person may have no expectation of privacy in premises searched sufficient to confer standing to challenge *the search*, standing is not thereby denied for all purposes. The court said:

> This is not to say that such visitors could not contest the lawfulness of *the seizure* of evidence or the search *if their own property were seized* during the search. (emphasis added).

*Rakas v. Illinois, supra* at 439 U.S. 142, 99 S.Ct. 421, 430, 58 L.Ed.2d 400, n.11. The court goes on to make the following specific observation on the impact upon standing of a property right in the seized article:

> One of the main rights attaching to property is the right to exclude others, see W. Blackstone, commentaries, book II, ch. 1, and *one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.* Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest. These ideas were rejected both in *Jones*, supra and *Katz*, supra. But by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, *the Court has not altogether abandoned use of property concepts* in determining the presence or absence of a privacy interest protected by the Amendment. (emphasis added).

*Id.* at 439 U.S. 143, 99 S.Ct. 430, 58 L.Ed.2d 401, n.12.

---

1. In fact, such observation was not a search in any event, as the majority points out by relying

on *Coolidge v. New Hampshire*, 403 U.S. 443, 468, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971).

There is nothing at odds with this concept, as approved explicitly in *Rakas, supra,* to be found in *Lo-Ji Sales, supra.* In *Lo-Ji Sales,* the Court does not indicate that it treats the seized items as anything other than property capable of lawful ownership by private individuals. Even if part of the items seized, namely the obscene magazines, were to be treated as contraband, the officers there seized *other* items, such as projectors and viewing equipment, which clearly would not be contraband and were the subject of lawful ownership.

For the reasons expressed above, it is my view that the proper reason why defendants have standing to contest the seizure of the gems from the Lamp Post is not that they had some "expectation of privacy" in the premises but rather that they have a proprietary interest in the gems themselves which gives them a sufficient interest in the legality of the seizure of those gems to challenge it.