**STATE of Maine**

v.

**Leland B. PHILBRICK.**

Supreme Judicial Court of Maine.

Argued Jan. 20, 1981.

Decided Oct. 27, 1981.

Charles K. Leadbetter (orally), William R. Stokes, Wayne S. Moss, Asst. Attys. Gen., Augusta, for plaintiff.

Smith & Elliott, P.A., Terrence D. Garmey (orally), Stephen R. Lamson, Karen B. Lovell, Peter W. Schroeter, Saco, Willard, Kellis & Wood, George F. Wood (orally), Sanford, for defendant.

Before WERNICK,* GODFREY, NICHOLS, ROBERTS and CARTER, JJ., and DUFRESNE, A.R.J.

DUFRESNE, Active Retired Justice.

Indicted September 8, 1977 on a single count of criminal homicide in the 2nd degree (17–A M.R.S.A. § 202(1)(A) (Supp. 1976),[1] the defendant, Leland Philbrick, was originally tried for and adjudged guilty of that crime by a Superior Court jury in York County in January, 1978. On appeal his conviction was set aside for error of the presiding justice in refusing to give the jury Philbrick's requested instruction that the defendant would be justified in using deadly force to repel a forcible sexual contact, if he reasonably believed that such a contact was about to take place and reasonably believed that the use of deadly force was necessary to repel it. *State v. Philbrick*, Me., 402 A.2d 59, 61 (1979); *see* 17–A M.R.S.A. § 108(2)(A)(2).

Tried a second time on the reference indictment in October 1979 before another jury of the Superior Court, York County, Philbrick was again convicted of criminal homicide in the 2nd degree. From the en-suing judgment entered on this jury verdict, the defendant brings his present appeal. We sustain the appeal and vacate the judgment.

### *Miranda violations*

Prior to trial, the defendant presented the court with a motion to suppress all statements that he made to the Saco police officers and to Officers Letarte and Greeley of the Maine State Police, on the ground that all these statements were obtained as the result of custodial interrogation in violation of the principles of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). At the suppression hearing, the State produced the testimony of Officer Charles Labonte of the Saco Police Department and Detective Roger Letarte of the Maine State Police. Although full development of the issue would have called for the testimony of Officers Dentico, Demarco and Greeley, the parties waived the same because of its stated repetitious character. We cannot approve such practice, especially in cases of such a serious nature as criminal homicides. At trial, however, counsel's objections to all five officers' testimony respecting Philbrick's particular statements to each of them were explicitly noted by the court, although overruled. In denying the defendant's motion to suppress, the court ruled in general terms that the initial contact between the police and the defendant Philbrick "involved the greater possibility that he [Philbrick] was a victim," that *Miranda* warnings were timely given and that the existing influences were not so coercive "as to interfere with the *Miranda* context."

### A

The facts leading to the shooting of the deceased, Charles M. Porterfield, sufficiently appear in our previous opinion (*State v.*

---

* WERNICK, J., sat at oral argument and conference, but retired prior to the preparation of the opinion herein.

1. 17–A M.R.S.A. § 202 (Supp.1976) reads in pertinent part as follows:
    1. A person is guilty of a criminal homicide in the 2nd degree if:

    A. He causes the death of another intending to cause such death, or knowing that death will almost certainly result from his conduct;
    This statute was repealed (P.L. 1977, c. 510, § 38, effective October 24, 1977); its present equivalent is 17–A M.R.S.A. § 201(1)(A)—murder.

*Philbrick, supra*); we need not repeat them at this point. The record shows that, after the incident, one David Fleming was driving toward the scene of the struggle on Smutty Lane Road in Saco, when he was flagged down by the defendant who told him that he thought he had "just killed somebody." On Fleming's suggestion, they set out for the Saco police station, Philbrick on the way blurting out the story of his encounter with Porterfield. At the station, upon observing the defendant covered with blood, with a knife in his left hand, and holding his injured right hand, Officer Labonte, who was in uniform, invited Philbrick to sit down and asked him *what happened*. The defendant answered:

"I got into a fight. The guy jumped me and took my knife away from me. I think I shot him."

At trial, counsel for the defendant objected to the admissibility of the rest of the conversation between Labonte and Philbrick, for the reason that no *Miranda* warnings were given by the officer to the defendant at any time, a fact conceded by the State. Over objection, the following colloquy went to the jury.

[Q.] How many times the gun went off?

[A.] Three or four times. I think I killed him.

[Q.] What kind of gun was involved?

[A.] A Charter Arms .44 Bulldog.

[Q.] Was it a rifle or pistol?

[A.] A pistol.

[Q.] How many people involved?

[A.] One.

[Q.] Describe him.

[A.] Five, six. Twenty-two years old and has brown hair.

Officer Labonte testified that Philbrick was not placed under arrest and the interview lasted no more than ten minutes. We find no error in the ruling below.

*Miranda* requires that, when an individual is taken into custody or otherwise deprived of his freedom by law enforcement personnel in any significant way *and* is subjected to questioning, the following procedural safeguards must be employed to protect the individual's privilege against self-incrimination.

"He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Miranda v. Arizona, supra*, 384 U.S. at 479, 86 S.Ct. at 1630.

In the absence of such warnings and waiver when required, both exculpatory as well as inculpatory statements are inadmissible against the accused. As stated in *Miranda, supra*, 384 U.S. at 477, 86 S.Ct. at 1629, statements meant to be exculpatory by the defendant might be used by the prosecution to impeach his testimony at trial or to discredit statements given under interrogation and thus could help prove guilt by implication.

*Miranda* warnings are mandated only where a suspect is both in custody and subjected to interrogation as these terms are understood under the *Miranda* doctrine. *State v. Cochran*, Me., 425 A.2d 999, 1001 (1981); *State v. Preston*, Me., 411 A.2d 402, 405 (1980). *See State v. Bleyl*, 435 A.2d 1349, 1357 n.5. In *Rhode Island v. Innis*, 446 U.S. 291, 299–300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 306–307 (1980), interrogation in the sense of *Miranda* was extended to include, besides express questioning by the police, any equivalent indirect questioning or suggesting which the police should know is reasonably likely to elicit an incriminating response by the suspect.

■ Volunteered statements of any kind, on the other hand, are not within the *Miranda* rule. *Miranda v. Arizona, supra*, 384 U.S. at 478, 86 S.Ct. at 1630. And we must distinguish between statements obtained as part of a "general investigation" and those secured in "custodial interrogation." The facts of each particular case must be closely examined to determine whether the line between the two has been crossed. *State v. Thurlow*, Me., 434 A.2d 1 (1981); *State v. Preston*, Me., 411 A.2d 402, 406 (1980); *State v. Price*, Me., 406 A.2d 883, 885 (1979).

■ There was nothing improper in Officer Labonte's inquiry of the defendant— what happened? Such a neutral and impersonal request for information at that initial stage qualified as a general on-the-scene questioning which police officers have a duty to carry on in their conventional investigation of criminal incidents or activities. At the time, Officer Labonte knew nothing about the circumstances under which Philbrick had received his injury, let alone that a possible crime had been committed by him. A noncustodial interrogation setting is not converted into a custodial interrogation situation merely because the questioning took place in a coercive environment such as in a police station or by a police officer. Psychological pressure emanating from an officer's authority or from the police station atmosphere alone is not sufficient under *Miranda* to create the "inherently coercive" environment triggering the application of the warning alert which the *Miranda* case has established as necessary for the protection of the constitutional privilege against self-incrimination. *State v. Craney*, Me., 381 A.2d 630, 632 (1978); *State v. Lewis*, Me., 373 A.2d 603, 608 (1977).

■ The follow-up questions by Officer Labonte for the purpose of clarifying the ambiguous situation did not constitute the critical police interrogation which *Miranda* contemplates. Questions asked in the wake of an event or occurrence which would naturally invite such an inquiry and which are characterized, as in the instant case, by brevity, neutrality and absence of an intent to elicit a confession or admission do not rise to the level of interrogation in the *Miranda* sense. *State v. Simoneau*, Me., 402 A.2d 870, 873–74 (1979).

### B

With Officer Labonte's information, the Saco police then knew that deadly force had been used in an encounter in which Philbrick and another person had been involved. Philbrick's statement that the gun went off three or four times and that he thought he had killed his alleged assailant suggested in the least that excessive force may have been used and that the defendant may have committed a serious crime. No question of identity remained. Thus, when Officer Dentico of the Saco Police Department questioned the defendant in the ambulance while on the way to the Webber Hospital in Biddeford, the interrogation took a different aspect. Its effect was to elicit the particulars of the commission of a crime by the defendant. Officer Dentico had been ordered to accompany Philbrick to the hospital, because Officer Labonte at the end of his interview with the defendant undoubtedly suspected that a crime had probably been committed by the defendant. The same is true respecting Saco Police Officer Demarco's interview with the defendant in the emergency room of the Maine Medical Center in Portland shortly thereafter. Both officers were in uniform, but neither gave *Miranda* warnings to Philbrick at any time. *See People v. Clark*, 84 Ill.App.3d 637, 40 Ill.Dec. 100, 405 N.E.2d 1192 (1980).

Both officers initiated their respective interrogation of the defendant by asking Philbrick the same question which had already caused the defendant to acknowledge to Officer Labonte that in his confrontation with his alleged assailant in a scuffle on Smutty Lane Road three or four shots had been fired and that he thought he had killed him. Philbrick's acknowledgment to Officer Labonte of his use of probably excessive deadly force resulting in the possible death of his assailant changed the situation from one where a police officer prior to that disclosure might reasonably think that he was speaking to a presumably innocent vic-

tim anxious to cooperate with the police in the solution of a violent crime to one where the injured person seeks to justify the probable commission of a homicide by making exculpatory statements. At that point the Saco police had sufficient probable cause to detain the defendant for further investigation concerning the defendant's statement that he thought he had killed his attacker. Any further investigation obviously would focus on his conduct involving the shooting. Following the information obtained by Officer Labonte, *Miranda* warnings should have been given, if the questioning was to continue or be resumed.

The knowledge of Officer Labonte is to be imputed to both Officers Dentico and Demarco who were working in complete and immediate coordination with Officer Labonte in investigating a probable criminal incident which might involve death of the victim. The collective information of the Saco police at the time these officers launched their respective interrogation of Philbrick must be taken into consideration in determining whether the line between a general investigation and a custodial interrogation has been crossed by the police. *See State v. Parkinson*, Me., 389 A.2d 1, at 8 (1978) (in relation to probable cause to arrest).

█ But the State contends that, absent police custody of the defendant at the time of interrogation by the Saco police officers, his statements made without benefit of *Miranda* warnings are admissible. We agree that police custody is a prerequisite of the *Miranda* doctrine. *State v. Cochran, supra; State v. Preston, supra; State v. Bleyl, supra.* The ultimate issue, therefore, is whether Philbrick was in police custody when he made his statements to Officers Dentico and Demarco. It is true that neither officer arrested the defendant. But, notwithstanding the absence of a formal arrest, custody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived.

In *State v. Thurlow, supra*, this Court adopted the objective reasonable-person perspective test as the proper standard for determining the question of custody for purposes of the *Miranda* rule.

In *State v. Bleyl, supra*, this Court held that the State bears the burden of disproving by the fair preponderance of the evidence the existence of a custodial interrogation situation.

█ The presiding justice in the instant case denied the defendant's motion to suppress his statements to the police and overruled his objections to their admissibility at trial without making specific findings of fact or conclusions of law. However, there is no dispute that the defendant's statements to Officers Dentico and Demarco were made by reason of and under police interrogation. Thus, we must conclude that the presiding justice's ruling on admissibility of these statements was based on an implied finding that the defendant was not in custody at the time. We hold that the record before us does not provide rational support for a finding by the preponderance of the evidence that Philbrick was not in custody during interrogation by Officers Dentico and Demarco. A reasonable person in the position of Philbrick, who had voluntarily submitted his person to the Saco police, thinking that he had killed a man, and who, after his explanation of the event at the station, was rushed to Webber Hospital with a police officer at his side probing the particulars of the scuffle, followed by questioning from a State police officer at that hospital, to be later transported to the Maine Medical Center, again with a police officer present who once more questioned him in the emergency room of that hospital regarding the details of the fight, would reasonably have felt that he was in custody of the police and that his freedom of action was at that point foreclosed. The presiding justice's implied finding to the contrary was clearly erroneous, manifestly derived from a misperception or misapplication of the law.

Conceding the appraisal of credibility of the testimony to the trial justice and giving substantial deference to his implicit findings of ultimate fact and conclusions of law

derived from his implied subsidiary findings, nevertheless, we find no rational support for his ultimate conclusion that Philbrick was not in custody when Officers Dentico and Demarco questioned him without *Miranda* warnings. The following factors so indicate. Philbrick's voluntary account to Officer Labonte of his encounter with Porterfield focused the investigation thereafter on the defendant's own conduct in the altercation; although the officers did not display aggressive action toward him, their continuing presence after his departure from the police station in the small confines of an ambulance or hospital emergency room would suggest a coercive impact of physical police constraint or in the least have a psychological potential on Philbrick for thinking his freedom of action was gone; the defendant was seriously injured, either attached to an ambulance stretcher or confined to a hospital bed awaiting surgical treatment or recuperative therapy; he was missing his glasses without which he was legally blind; he had no friends or family to boost his morale or to whom he could turn for advice; the defendant's physical condition effectively precluded him from leaving the scene of his interrogation or getting away from the police. Police officers cannot take advantage of a coercive situation which limits an accused's freedom of action and then proceed to interrogate him without proper *Miranda* admonitions. *See Scales v. State*, 64 Wis.2d 485, 219 N.W.2d 286, 291 (1974).

Under all the circumstances of this case, a reasonable person would receive the impression that the defendant was being forcibly detained, notwithstanding he was not formally arrested, where the police did absolutely nothing to disabuse his mind of any inner feeling of being in police custody which the totality of the factual situation would naturally generate. The use of Philbrick's statements obtained by Officers Dentico and Demarco without the required

*Miranda* warnings was a violation of his Fifth Amendment privilege against self-incrimination.[2]

### C

Detective Letarte of the Maine State Police interviewed the defendant in the emergency room of Webber Hospital at 1:15 a.m. on July 12, 1977, within the hour after Philbrick had appeared at the Saco police station and given his account of the shooting to Officer Labonte. The Saco police had further obtained a rather full recital of the details of the affair through Officer Dentico who had already questioned the defendant while he was being transported in the ambulance from the station to the hospital; at no time had the defendant been advised of his *Miranda* rights.

When Letarte reached the hospital, both Porterfield and Philbrick were there. The detective had already been informed that two individuals were involved in a shooting episode, that one had been shot three times, twice in the chest and once in the head, and that the other suffered a gunshot wound to his hand. Captain Nason of the Saco Police Department had so informed him. Dr. Morrison identified to Letarte the injured persons and advised him that he could talk to Philbrick, but not to Porterfield who was then undergoing surgery.

Briefed by the doctor on the seriousness of Porterfield's condition (Porterfield died later that morning), the detective, who was in plain clothes, proceeded to have the defendant relate to him a summary description of what had happened, before advising him of his *Miranda* rights.

After giving proper *Miranda* warnings, Letarte then read to Philbrick the written statement compiled to that point and asked him if he had told him the truth. The defendant answered in the affirmative. Thereafter, the interview continued to flesh out more details of the fray.

**2.** We express no opinion regarding whether the erroneous admission at trial of the defendant's statements to Officers Dentico and Demarco would, alone, have required vacation of his conviction. Error at trial, even though of con-stitutional dimensions, will not require reversal, if it was harmless beyond a reasonable doubt. *See State v. Hassapelis*, Me., 404 A.2d 232, 237 (1979).

The record discloses that the Saco police and the State police were coordinating their separate investigation of a possible, if not probable, criminal homicide as a team effort with full cooperation from both agencies. Prior to his interrogation of Philbrick, Letarte knew that the defendant had been interviewed by Officer Dentico minutes before he was permitted to see him; he knew the seriousness of Porterfield's condition and, as a reasonable experienced police officer, he was aware that his investigation should concentrate on the particular conduct of the defendant which from all appearances seemed to indicate that the defendant had committed a serious crime, be it aggravated assault or possibly a criminal homicide; he further must have realized that the defendant was practically locked in the emergency room of Webber Hospital, awaiting treatment for a gunshot wound, with Saco police officers in the wings. Detective Letarte should not have taken advantage of the existing coercive situation in which Philbrick as a reasonable person would perceive he was and then proceed to interrogate him and get the full account of the affray with which he was involved without giving him from the beginning proper *Miranda* admonitions. With due deference to the implicit finding of the justice below, we believe that the evidence falls short of providing rational support for the conclusion that there was no custodial interrogation. Hence, the statements made by Philbrick to Officer Letarte should have been suppressed in whole.[3]

The belated giving of *Miranda* warnings by Officer Letarte, as was done in this case, after Philbrick had made a full disclosure of his conduct in a custodial interrogation setting, did not purge his subsequent statements of the taint of the previous illegal interrogation. *See Commonwealth v. Ware*, 438 Pa. 517, 265 A.2d 790 (1970). Having let the cat out of the bag by making inadmissible statements in a custodial interrogation context, an accused's subsequent statements, even if made under proper *Miranda* warnings, must be viewed as given under the psychological pressures of having already made those incriminating statements and must be considered as the fruit of the first unlawful interrogation, unless the taint of illegality is so attenuated by time, place or other sufficient motivation as to break the link between the two. In the instant case, the circumstances surrounding the first portion of the Letarte interview which served to invalidate Philbrick's statements given without *Miranda* warnings carried over to make the second portion of the questioning likewise inadmissible. Here, the second group of statements were procured immediately after the illegally obtained first group of statements, there being a pause in the interview for the sole purpose of giving *Miranda* warnings prior to the repetition of the prior inadmissible statements. The mere recital of the warnings in the circumstances of this case did not break the natural linkage between the two parts of an otherwise continuous custodial interrogation. *See People v. Saiz*, Colo., 620 P.2d 15, 19–20 (1980). The State failed to sustain its burden to establish that the second set of statements were not the product of the earlier ones which were illegally obtained. *See Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); *People v. Founds*, Colo., 621 P.2d 325 (1981).

### D

Detective Letarte later that same morning at 5:30 a. m. at Maine Medical Center

---

3. We intimate no opinion as to the admissibility vel non of the Philbrick statements to Officer Letarte, if the detective had informed the defendant of his *Miranda* rights at the beginning of his interrogation. We leave open the question whether knowledge of members of a distinct and separate authority, such as the Saco police, would be chargeable to State police personnel conducting a separate or combined investigation; also, whether previous admissions or statements made to one law enforcement authority without required proper *Miranda* admonishments, such as the admissions in this case to Officer Dentico, would render subsequent admissions or statements to another authority given after receiving proper *Miranda* warnings inadmissible as tainted by the prior unlawful interrogation. *See People v. Perry*, 38 Ill.App.3d 81, 347 N.E.2d 340 (1976); *Westover v. United States*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

interviewed Philbrick a second time for another half hour, when the full story of the incident was again repeated by the defendant at the officer's urging. *Miranda* warnings were not renewed at that time. Again, the officer revisited Philbrick, in company of Officer Martin Greeley of the Maine State Police, in the early afternoon of the same day. Letarte on this occasion read to the defendant the *Miranda* warnings line by line and Philbrick repeated for the benefit of Officer Greeley his version of the shooting as he had previously to the detective and the Saco police, amplifying many areas in the sequence of events. Shortly after 5:00 o'clock that same afternoon, Officer Greeley for the second time, with another member of the State police, again questioned the defendant for nearly one hour to clear up, as he informed Philbrick, certain inconsistencies. Proper *Miranda* warnings preceded that interview. Finally, Officer Greeley paid the defendant a third visit about one hour later, properly advising him of his rights; the purpose of this call was to find out if Philbrick might not have taken Porterfield's ring which was missing.

The Greeley interviews, though conducted following proper *Miranda* admonitions, were impregnated with the illegal taint which affected the previous Letarte custodial interrogation. Letarte's presence at the first Greeley conversation served to associate that meeting of state police personnel with the previous one. And nothing happened between the interviews that day to dispel the association which a reasonable person in the position of Philbrick would connect with the original inadmissible statements made to Detective Letarte. Although an accused who gives a statement under circumstances violative of his constitutional rights is not perpetually disabled from making subsequent admissible statements (*see United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947)), under the circumstances of this case, neither a sufficient amount of time nor truly informed reflection had been permitted the defendant. At no time was the defendant apprised of Porterfield's death. The several state police custodial interrogation sessions from the first to the last were designed and executed to make a case against the defendant as against a mere honest-to-goodness investigatory inquiry. We hold under the "cat out of the bag" doctrine that Philbrick's subsequent statements to Officer Greeley were not sufficiently insulated and disassociated from the first inadmissible statements given to Officer Letarte to avoid the original taint of illegality which carried over. The doctrine requires "the exclusion of a statement if, in giving the statement, the defendant was motivated by a belief that, after a prior coerced statement, his effort to withhold further information would be futile and he had nothing to lose by repetition or amplification of the earlier statements." *Commonwealth v. Meehan*, Mass., 387 N.E.2d 527, 537, cert. dismissed, 445 U.S. 39, 100 S.Ct. 1092, 63 L.Ed.2d 185 (1979). The defendant's statements to Officer Greeley should not have been admitted in evidence.

*Violation of Fourth Amendment Rights*

When Detective Pinette of the Maine State Police arrived at the Smutty Lane Road for the purpose, in his own words, of investigating a possible homicide, the defendant's bloodied knapsack was at the side of the road with all its compartments buckled shut; the police had secured the area and were allowing no traffic to pass. Pinette had been informed that the victim had been shot at least three times and was badly wounded. He knew from Detective Letarte that the knapsack belonged to Philbrick. Conceding that there was no danger of the knapsack "disappearing or going anywhere" as the whole area was under complete police control, Officer Pinette, intent on locating the firearm involved in the shooting, took possession of the knapsack, removed its contents, photographed and seized them. As he stated, this was something that could easily be done while waiting for daylight to search the surrounding woods.

After hearing, the presiding justice ruled that the knapsack and its contents could be

admitted in evidence at trial and denied the defendant's pretrial motion to suppress. Several items discovered in the warrantless search of the knapsack were entered in evidence, such as, among other things, a hexnut, a wooden stick, a box of ammunition, five .44 caliber expended shells, one revolver with two live rounds, one holster, and a blue T-shirt. The court reasoned that the knapsack had been "abandoned" at such a place in the roadway that all who happened to pass by would see it, precluding, so it inferred, any claim of expectation of privacy therein by the owner. In this, there was error.

The Fourth Amendment to the Constitution, which is made applicable to the States through the Fourteenth Amendment, establishes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The central thrust of the constitutional guarantee is to protect the privacy interest of individuals against intrusive incursions of agents of government. One's claim of protection under the Fourth Amendment depends not upon a property right in the invaded place or article of personal property but rather upon whether the person has a legitimate expectation of privacy in the invaded place or thing. *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967); *United States v. White*, 401 U.S. 745, 752, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971); *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977); *State v. Sweatt*, Me., 427 A.2d 940, 946 (1981); *State v. Richards*, Me., 296 A.2d 129, 132 (1972).

Warrantless searches are *per se* unreasonable, subject to a few specifically established, carefully drawn and much guarded exceptions. *Katz v. United States, supra*, 389 U.S. at 357, 88 S.Ct. at 514; *State v. Hassapelis*, Me., 404 A.2d 232, 236 (1979); *State v. Dunlap*, Me., 395 A.2d 821, 824 (1978). The burden is on the State to prove by the fair preponderance of the evidence underlying facts bringing the case within one of the exceptions. *State v. Dunlap, supra*, at 824; *State v. Heald*, Me., 314 A.2d 820, 829 (1973).

Abandoned property is excepted from the Fourth Amendment warrant requirement. *City of St. Paul v. Vaughn*, 306 Minn. 337, 237 N.W.2d 365 (1975); *see generally* 1 LaFave, *Search and Seizure* § 2.6(b) (1978) and cases cited therein. A person who has voluntarily abandoned property cannot complain of its search and seizure. *United States v. Jackson*, 9th Cir., 544 F.2d 407, 409 (1976).

Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment should be considered. *United States v. Colbert*, 5th Cir., 474 F.2d 174, 176 (1973), and cases cited. Abandonment in the constitutional sense, *i. e.*, in the law of search and seizure, exists only if the defendant has voluntarily discarded the property, left it behind, or otherwise relinquished his interest therein under circumstances indicative of his foregoing any further reasonable expectation of privacy with regard to it at the time of the search. *Id.* at 176; *City of St. Paul v. Vaughn, supra*, 237 N.W.2d at 370–71.

As stated previously, it was the State's burden to establish at the suppression hearing, by a preponderance of the evidence, its claimed exception to the warrant requirement under the Fourth-Fourteenth Amendments, here, that Philbrick had abandoned his knapsack in the constitutional sense, *i. e.* that he had relinquished "any reasonable expectation of privacy in it." *State v. Johnson*, Me., 413 A.2d 931, 933 (1980); *State v. Blais*, Me., 416 A.2d 1253, 1256 (1980).

While the court below found as a fact that the mere leaving of the knapsack on the side of Smutty Lane Road constituted an abandonment of the property and a relinquishment of any reasonable expectation of privacy with regard to its contents, such factual conclusion, we believe, was clear error under the "clearly erroneous" standard by which such rulings of fact

mixed with law are to be judged on review. The State did not meet its burden of proof by the fair preponderance of the evidence that Philbrick had in fact relinquished all reasonable expectation of privacy in the contents of the knapsack as we will explain later. The justice should have suppressed the evidence produced by the warrantless search.

While it is true that the defendant left his knapsack by the side of a public highway where any curious passer-by might have examined it (cf. United States v. Smith, D.C.App., 293 A.2d 856 (1972)), the knapsack's location is the only fact which, if considered in isolation, might suggest that the defendant abandoned it. The totality of the evidence in this record, however, clearly points to a contrary conclusion: the defendant had replaced his gun in the knapsack after the shooting and rebuckled all the closings so that the contents of the pack were not visible; the defendant was emotionally agitated and suffering from a gunshot wound when he stopped David Fleming's car and accepted a ride to the Saco police station; and, the defendant never disclaimed ownership of the knapsack but rather told the Saco police that it was his, so that police knew that the pack belonged to the defendant rather than to the decedent.[4]

The United States Supreme Court has several times explored the expectation of privacy associated with personal luggage, most recently in United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) and in Arkansas v. Sanders, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). In Sanders the Court noted that a suitcase, even unlocked, possessed a "fundamental character as a repository for personal, private effects" and was inevitably associated with the expectation of privacy. 442 U.S. at 762 n. 9, 99 S.Ct. at 2592 n. 9. See also State v. Blais, supra, at 1257. All compart-

ments of the defendant's pack were securely buckled; the contents of the pack were not visible, nor could they be identified by the outward appearance of the pack. See State v. Blais, supra, at 1257; State v. Hassapelis, supra, at 237. Cf. Arkansas v. Sanders, supra, 442 U.S. at 764 n. 13, 99 S.Ct. at 2593. The defendant had acted purposefully to secure the contents of the knapsack.

Moreover, the defendant's actions in leaving the Smutty Lane Road distinguish his case from that of defendants in the great majority of cases where property has been found to be abandoned in the Fourth Amendment context. The typical abandonment case is one where the defendant purposefully discards weapons or contraband while police are approaching or are in hot pursuit. See 1 LaFave, Search and Seizure, supra at § 2.6(b) and cases cited at nn. 36–43. See also 1 W. Ringel, Searches and Seizures, Arrests and Confessions § 8.5(a) nn. 170–174 (1980). In the instant case, the defendant merely left his property behind him, more or less of necessity, making no attempt, however, to discard it or disassociate it from himself.

■ The State argues alternatively that the warrantless search of the knapsack was justified under the so-called "homicide scene" exception of the now-discredited case of State v. Chapman, Me., 250 A.2d 203 (1969). See State v. Johnson, Me., 413 A.2d 931, at 934 (1980), where we said: "Although this Court in the past has recognized an exception for homicide scene searches, see State v. Chapman, . . ., we conclude that decision has lost its vitality as a result of the ruling of the United States Supreme Court in Mincey v. Arizona, [437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)] . . . ." Because Chapman was allegedly in force at the time of the search, the State contends that a good faith warrantless search made by police in reliance on Chapman should not

4. While the defendant's property interest in his knapsack alone might not support his standing to object to the warrantless search of his pack and seizure of its contents, it is one factor to be considered in determining whether the defendant's Fourth Amendment rights have been vio-

lated. United States v. Salvucci, 448 U.S. 83, 91, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619, 628 (1980); Rakas v. Illinois, 439 U.S. 128, 144 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387 (1978); see State v. Sweatt, Me., 427 A.2d 940, 945 (1981).

result in suppression of the evidence produced by such a search. The State bases its argument on the Supreme Court's rationale, set forth in *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975) that, in criminal prosecutions, new constitutional principles unrelated to the truth-finding function should be accorded prospective application only. Thus, expansions of the scope of the exclusionary rule, the primary function of which is not to aid in truth-finding but rather to deter police misconduct, should apply *in futuro* only. The Court of Criminal Appeals of Texas relied on *Peltier* to refuse to apply *Mincey* to a warrantless "homicide scene" search conducted in good faith before *Mincey* was decided. *Pearson v. State*, 587 S.W.2d 393, 396 (1979). The State urges a similar approach in the case before us.

The search of Philbrick's knapsack was conducted on *July 12, 1977.* Our case of *State v. Chapman*, which pioneered the "homicide scene" exception to the warrant-requirement rule, was decided on *January 2, 1969.* The defendant's first trial took place in January, 1978. *Mincey v. Arizona, supra,* decided *June 21, 1978,* held that the "murder scene" exception created by the Arizona Supreme Court was inconsistent with the Fourth and Fourteenth Amendments and that the warrantless search of Mincey's *apartment* was not constitutionally permissible merely because a homicide had recently taken place there. The State does concede that the present search and seizure were in violation of the principle announced in *Mincey.* The defendant's first conviction was set aside in 1979 on other grounds. His second trial and conviction occurred in October of that year. Thus, the instant search and first trial were conducted prior to the *Mincey* decision, while the second trial came off afterwards. If the facts of this case did involve a "homicide scene" within the meaning of *State v. Chapman, supra,* then we would be confronted with the question whether the ruling in *Mincey v. Arizona* should be given retroactive effect or mere prospective application. We believe, however, that the *Chapman* rule has no applicability to this

case, and we need not decide, nor do we intimate any opinion on, the effect of *Mincey* upon searches conducted prior to the decision of that case.

■ At the time of the *Chapman* ruling, the state of the law was such that it was generally recognized under the emergency exception doctrine to the warrant-requirement rule that the Fourth Amendment did not bar police officers from making warrantless entries and searches in private premises when they reasonably believed that a person within the building was in need of immediate aid, *i. e.* if it reasonably appeared to them that they were confronted with a life or limb threatening situation. Courts stated it was obvious that, if denied entry into homes or apartments under such exigent circumstances, police officers would have the right, if not the duty, to gain entry forcibly. *United States v. Barone*, 330 F.2d 543, 545 (1964), cert. denied 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053; *Davis v. State*, 236 Md. 389, 204 A.2d 76 (1964); *Patrick v. State*, 227 A.2d 486, 489 (Del.1967); *State v. Gosser*, 50 N.J. 438, 448, 236 A.2d 377, 382 (1967). The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal, absent an exigency or emergency. *Wayne v. United States*, 115 U.S.App.D.C. 234, 241, 318 F.2d 205, 212 (1963).

The *Chapman* Court necessarily would have considered the later articulation of the exigent circumstances exception, to the extent that it went, at least consistent with its own formulation of the homicide scene processing theory, and would have found no reason to object to the statement of this Court in *State v. Johnson, supra,* at 933:

"The knowledge that there was an apparently dead body on the premises ... created exigent circumstances. There was a compelling need for the law enforcement officers to secure immediate entry to determine whether the apparent victim was alive or dead, whether there were other victims in the house and whether the perpetrator was about the premises and to secure evidence, such as

latent fingerprints and bloodstains, which by the passage of time might have become unavailable."

See also *Mincey v. Arizona, supra,* 437 U.S. at 392, 98 S.Ct. at 2413.

Also, the *Chapman* Court understood that once the police were lawfully on the premises objects falling in the plain view of an officer "who has a right to be in the position to have that view" are subject to seizure, as it cited for that proposition the case of *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968).

The *Chapman* Court recognized that the discovery of the crucial bloodied bottle in a trash can in the closed basement garage of the Chapman home was the product of a search and set out to legitimize the search and seizure as not unreasonable in the "totality of circumstances" of the case. The Court considered as controlling in its ultimate formulation of what was later designated as the "homicide or murder scene" exception to the warrant-requirement rule, the following factual and legal conclusions: 1) the initial entry by the police was consensual; 2) the police never abandoned their possession and control of the Chapman premises; 3) the police were faced at once with the death of Mrs. Chapman under circumstances strongly suggestive of the possibility of violent death or homicide; 4) thus, from the very moment of the initial entry in the Chapman home, under the circumstances observed by the officers, there arose the duty on the part of the police to make a thorough investigation to determine whether the decedent was the victim of foul play and if so by whom and by what means; 5) the right of the public to a prompt and diligent police investigation of the Chapman premises to ascertain the cause of the apparently violent death of Mrs. Chapman and to solve any crime committed in the course thereof rose above the interest of the individual defendant in being protected from governmental intrusion upon his rights of privacy of his home; 6) the alleged impossibility of procuring a search warrant, because no officer could describe with any degree of specificity the weapon to be searched for; 7) the delay in seeking a magistrate on a legal holiday for the procurement of a search warrant might well have been costly; 8) there were risks of removal or destruction of the evidence attendant upon delay in proceeding with and completing the investigation.

The *Chapman* scenario was not present in the instant case. First, we are not dealing with the warrantless entry and search of a home initiated by the exigencies created by an apparently dead body therein with which the Court was faced in *Chapman.* Here, the potential homicide was committed in a public way, or in the surrounding woods, which the police have a right to enter and search without warrants. Secondly, there were no exigent circumstances calling for the initial warrantless entry and search of private premises as in *Chapman,* and, therefore, there existed no justification for the warrantless search of Philbrick's knapsack, anymore than the search without a warrant of a parked automobile or an adjacent household that might happen to be on the highway or close to the woods would have been justified. A warrantless search as conceded by the *Chapman* Court must be "strictly circumscribed by the exigencies which justify its initiation."

"[E]vidence may not be introduced if it was discovered by means of a seizure and search which were not *reasonably related in scope* to the justification for their initiation." (Emphasis in original).

*State v. Chapman, supra,* at 209; *Mincey v. Arizona, supra,* 437 U.S. at 393, 98 S.Ct. at 2413; *Terry v. Ohio,* 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889. The right to seize and search the defendant's knapsack, without a warrant, must be independently established under ordinary Fourth Amendment standards, where the knapsack was found in plain view at the side of a public way on, or in the vicinity of, which a potential unlawful homicide might have been committed. *See State v. Blais, supra,* at 1257. Thirdly, the known weapon in this case, a gun, did not present the predicament in *Chapman* of the alleged impossibility of

securing a search warrant. Fourthly, if the police had sought a magistrate to obtain a search warrant of the knapsack, they most probably would have had easy access to one within a reasonable time. Officer Pinette himself testified that his reason for his immediate search of the knapsack was that this could easily be done while waiting for daylight to search the surrounding woods. Fifthly, there were no risks of removal or destruction of the evidence attendant upon delay of the search of Philbrick's knapsack, as the investigation of the surrounding wooded area had to await sunrise.

The case is distinguishable from *State v. Chapman* and the so-called homicide scene exception to the warrant-requirement rule as evolved in that case was not applicable.

■ This record clearly shows that Philbrick left the Smutty Lane Road area suffering from a gunshot wound to the hand which required emergency treatment. He left his knapsack on the side of the road in a completely secured condition, although no locking device was attached to it. The totality of the evidence supports, as the only conclusion to be derived therefrom, that Philbrick did not in fact discard his knapsack, but, prior to leaving, buckled it shut to protect his right of privacy as to its contents. Once the knapsack came securely within the control of the police, the mere fact that it was seized at the scene of a possible homicide when no exigent circumstances existed did not in and by itself establish a greater need or justification for a warrantless search, any more than if it had been seized in the course of a lawful search of an automobile. *See Robbins v. California*, —— U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981); but *see* Criminal Law Reporter, Vol. 30, No. 2, at 1005 on reconsideration.

In *Robbins*, the United States Supreme Court held that a seized opaquely wrapped and sealed package found in a recessed luggage compartment of a station wagon in the course of a lawful search of the automobile could not be opened without a search warrant. The Court held that the Fourth Amendment protects people and their effects, whether those effects are "personal" or "impersonal," (*Id.* —— U.S. at ——, 101 S.Ct. at 2846); that the contents of containers, unless they may be said to be in plain view, are fully protected by the Fourth Amendment, and that, absent circumstances constituting a valid exception to the warrant-requirement rule, the opening of closed containers without a search warrant is in violation of the Fourth and Fourteenth Amendments.

While the police could lawfully seize the bloodied knapsack itself as relevant evidence in a possible homicide case or lesser charge and could have obtained later a warrant to search the same, no circumstances justified the on-the-scene warrantless search of the inside of the pack. The circumstances immediately preceding the search did not establish the existence of any special exigency within the scope of the emergency exception to the general rule requiring a search warrant.[5]

When properly secured, Philbrick's knapsack was a piece of luggage in which he had a constitutionally protected right of privacy. *See State v. Hassapelis*, Me., 404 A.2d 232, 237 (1979) (a zippered gym bag); *United States v. Benson*, 8th Cir., 631 F.2d 1336, 1337 (1980) (closed but unlocked leather tote bag); *United States v. Meier*, 10th Cir., 602 F.2d 253, 255 (1979) (closed but unlocked backpack); *United States v. Johnson*, 5th Cir., 588 F.2d 147, 151–52 (1979) (closed duffel bag); *State v. Filipi*, 297 N.W.2d 275 (Minn.1980) (closed duffel bag); *United States v. Cleary*, 9th Cir., 645 F.2d 740 (1981) (closed canvas bag with broken zipper). *Cf. United States v. Goshorn*, 1st Cir., 628 F.2d 697 (1980) (paper bag).

### Expert Evidence

The defendant objected at trial to the admission of certain demonstrative evidence

---

**5.** We note that this was not a search incident to a lawful arrest, such as, *e. g.* in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, (1969); nor an inventory search, such as *e. g.* in *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *State v. Hudson*, Me., 390 A.2d 509 (1978).

and to "expert" testimony regarding the sequence of shots fired by him.

Maine State Police Detective James Pinette conducted an in-court demonstration using the front seat and dashboard of Charles Porterfield's car and using mannequins to represent Porterfield and the defendant. Based on his knowledge, through the autopsy report, of the location of Porterfield's wounds, and based on the apparent paths of the three discharged bullets, the location of blood spatters in the interior of the car and a pathologist's opinion that Porterfield's skull wound was the fatal wound, Detective Pinette "reconstructed" for the jury the sequence of the shots fired by the defendant and the relative positions of Porterfield and the defendant as each shot was fired. Pinette used the mannequins to "demonstrate" that the "second" shot was fired while Porterfield had his back to the defendant, raising by this display the strong implication that Porterfield was attempting to leave the car. Pinette then "demonstrated" that the "third" and fatal shot to Porterfield's head was fired while the two men were some distance apart (2 to 3½ feet), implying that the fatal shot was purposeful.

It cannot be disputed that this demonstration had a tremendous impact in the case and helped to a great degree in convicting the defendant. Philbrick, by his own admission to David Fleming and to Saco Police, had caused the death of Charles Porterfield. However, he claimed throughout that his conduct was not punishable as a crime because under the law he was justified to use deadly force, acting, as he contended, under an honest and reasonable belief that Porterfield was about to commit a forcible sex offense against him and an honest and reasonable belief that deadly force was required to repel the attack. The Pinette demonstration, with its clear tendency to show that the defendant acted intentionally when he shot Porterfield, struck at the heart of the defendant's defense.

Detective Pinette's demonstration and testimony raise two primary problems:

first, Porterfield's car had been sold and altered during the period between the defendant's two trials and was no longer in the same condition as at the time of the shooting, and, second, Detective Pinette based his opinion regarding the positioning of the bodies *in part* on the evidence of blood spattering in the car without being qualified formally as an expert in such matters. We will address these two issues in the order in which they arose at trial.

### A. The in-court demonstration

At some time after the defendant's first trial, Porterfield's car was sold and adapted for stock-car racing. The windshield, which had been damaged by a bullet, had been replaced; headrests on the front seats had been removed; bloodstains on the dashboard and seat upholstery had been cleaned or had faded after the passage of time. Perhaps most importantly, Detective Pinette did not measure the distance from seat to dashboard until some two weeks before the second trial. Although photographs of the front seat in its original state were available to Pinette, there does not seem to be accurate, verifiable evidence that positions of the dashboard and seat at the time of trial were the same as at the time of the shooting. In addition, the mannequins used in Pinette's demonstration did not purport to replicate the physical characteristics of Porterfield or of the defendant.

The persuasive power on juries of in-court demonstrative evidence is widely conceded. See McCormick on Evidence § 212 (2d ed. 1972) ("seeing is believing"). A trial court should exercise its discretion carefully before permitting such demonstrations because

> . . . even if no essentially emotional response is likely to result, demonstrative evidence may convey an impression of objective reality to the trier. Thus, the courts are frequently sensitive to the objection that the evidence is "misleading" and zealous to insure that there is no misleading differential between objective things offered at trial and the same or different objective things as they existed at the time of the events or occurrences in litigation.

**860**

It is clear to us that whatever relevance this demonstration had to prove the defendant's intent or to cast doubt on his credibility, that relevance was greatly outweighed by the highly prejudicial effect of Pinette's rough reconstruction, using techniques of non-verifiable accuracy of events he was not present to see. M.R.Evid. 403.[6] The prejudicial effect of the demonstration was reinforced by Pinette's trial testimony, offered without apparent proper foundation, that he had duplicated the experiment outside of court using "live bodies."

The State's reconstruction of the occurrence through the alleged expertise of Detective Pinette, cast in the context of a posed in-court demonstration, plus his stated out-of-court demonstration with live models, did not portray the Porterfield automobile in substantially the same condition it was in immediately after the shooting: the bullet-shattered windshield had been removed, the bloodstains in the interior of the car were missing and the distance measurements between the seat and the dashboard were not subject to accurate determination. There was no showing of comparative similarity between the mannequins, or the live subjects used in the demonstrations, and the two persons involved in the altercation in respect to weight, height, physical strength or skill and emotional temperament. Such experimental demonstrative evidence in the eyes of jurors, because of its asserted foundation in scientific principle or technique, carried such an inherent objective impact that it could unduly influence the jury in its findings of the underlying necessary facts at issue, without adequate basic facts to sustain a scientific conclusion, plus the absence of adequate opportunity to the defendant in this case to meet such damaging evidence resting in surmise and conjecture. *Cf. Poulin v. Bilodeau,* 161 Me. 306, 311, 211 A.2d 547, 550 (1965).

It was error for the trial court to permit this demonstration, with its potential for ineradicable prejudice to the defendant's case.

**B.** *Detective Pinette's testimony regarding the evidence of blood spattering*

A separate issue, but one intertwined with the issue raised by the in-court demonstration, arises out of Detective Pinette's testimony regarding the blood spatters in Porterfield's car. Detective Pinette had based his opinion regarding the sequence of shots and sequential positions of Porterfield and the defendant in part on his observations of blood spatters in the car. Defense counsel objected on the ground that Pinette had not been properly qualified as an expert.

Pinette testified before the jury that he had received "special training in blood spatters [a three-week course] in New York State under Professor Herbert MacDonald," and the State argued out of the presence of the jury that Pinette had merely analyzed all the information he had, using the "logic and expertise of a crime scene reconstruction." However, the presiding justice conducted no voir-dire to determine the extent of Pinette's qualifications or the state of the science in respect thereto, nor did he ever formally rule on whether Pinette was offering lay or expert opinions.

It seems clear that opinions based on observations of blood spatters and what they show regarding the sequence and directions of gunshots are matters encompassed by Maine Rule of Evidence 702. When a party offers the testimony of a witness as that of an "expert," the presiding justice must exercise his discretion to make two determinations: first, whether testimony on the subject matter calls for "specialized knowledge" that would "assist the trier of fact to understand the evidence" and second, whether the witness is qualified to give the opinion sought. M.R. Evid. 104(a), 401, 702; R. Field and P. Murray, Maine Evidence § 702.1 (1976). *See*

---

**6.** Rule 403, M.R.Evid. provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, con-fusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*State v. Boutilier,* Me., 426 A.2d 876, 878 (1981); *Parker v. Hohman,* Me., 250 A.2d 698, 702 (1969).

■ The proffered testimony is also subject to the general relevance requirements of Maine Rules of Evidence 401 and 402 and, even if relevant, may be excluded if its probative value would be outweighed by the countervailing considerations of Rule 403. *See State v. Boutilier, supra; State v. Williams,* Me., 388 A.2d 500, 504 (1978); *see also* R. Field and P. Murray, Maine Evidence, *supra,* at §§ 704.1, 403.1. One of the factors the presiding justice should consider in determining whether proffered testimony will be relevant and helpful to the fact-finder is whether the scientific matters involved in the testimony have been generally accepted or conform to a generally accepted scientific theory. *State v. Williams, supra,* 388 A.2d at 504. "General scientific acceptance" is not a *sine qua non* of a proposed method of determining facts; however, in order to be admissible the proffered expert testimony must be demonstrated to have *sufficient reliability* to satisfy the evidentiary requirements of relevance and helpfulness, and of avoidance of prejudice to the defendant or confusion of the factfinder. M.R.Evid. 402, 702 and 403; *see State v. Boutilier, supra,* 426 A.2d at 879.

■ We conclude that, because Officer Pinette's opinion about what the blood spattering in the car showed regarding the relative positions of the defendant and the victim at the time of the shooting was the kind of evidence clearly encompassed by Rule 702, it was error for the presiding justice to fail to consider and rule upon the above-enumerated factors. We further conclude that this was not a harmless error within the meaning of Maine Rule of Criminal Procedure 52(a). While Detective Pinette's testimony regarding his short three-week training course at "blood-spatter school" alone might have called into question his qualifications to give the opinion sought by the State, *see State v. Boutilier, supra,* even more serious questions about the relevance, helpfulness, and potential prejudicial effect of Pinette's proffered opinion were raised by the prior testimony of the pathologist who conducted the autopsy on Porterfield and by defense counsel's argument against the admissibility of Pinette's opinion.

While Pinette "deduced," based on the autopsy information and the pattern of blood spattering in the car, that the three shots fired by the defendant must have come in a certain order, the autopsy pathologist himself was unable to assign a sequence to the wounds. Moreover, defense counsel informed the presiding justice in the absence of the jury that the pathologist had told him that several variables might affect blood velocity and, therefore, the pattern of blood spatters: he also advised the court that "there's no literature on the subject [of using blood spattering as a means of assigning a sequence to gunshots]." While defense counsel's argument was not evidence, it should have alerted the presiding justice to the fact that Pinette's methods may have lacked sufficient scientific reliability to provide the basis for expert opinion testimony. *Cf. State v. Boutilier, supra; State v. Williams, supra; Parker v. Hohman, supra.* Further inquiry into the state of this "science" was in order; failure to make such an inquiry was error. Furthermore, any relevance Detective Pinette's opinion may have had to prove the sequential order of the defendant's use of deadly force in his encounter with Porterfield was greatly outweighed by the prejudicial possibility that the jury was persuaded to disbelieve the defendant's defense on the basis of "scientific" evidence of doubtful reliability. M.R.Evid. 702, 401, 402, 403; *Cf. State v. Boutilier, supra.*

The combination of Detective Pinette's in-court demonstration of the shooting incident and his "expert" opinion testimony regarding the positions of the bodies when each shot was fired tainted the trial with reversible error.

*Evidentiary Rulings*

The defendant's remaining allegations of error center on evidentiary objections he made at trial, one of which we will now discuss.

Brian Tate, who had attended a party in Freeport with Porterfield prior to the latter's trip to Saco, testified that: (1) Porterfield had attended the party reluctantly because he was tired and had to get up for work the next morning at 5:30 a. m.; and, (2) that Porterfield had left the party alone at about 10:30 p. m. after telling Tate he intended to go directly home.

The State contends that Tate's testimony regarding Porterfield's statements was admissible as a hearsay exception pursuant to Maine Rule of Evidence 803(3). The defendant contends that Rule 803(3) did not permit admission of the Tate testimony and that the defendant's Sixth Amendment right to confront the witnesses against him was violated.

Maine Rule of Evidence 803(3)[7] incorporates the common law "present mental state" exception to the hearsay rule of *Mutual Life Insurance Company v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). *See State v. Cugliata*, Me., 372 A.2d 1019, 1027 (1977); Advisers' Note to M.R. Evid. 803; R. Field and P. Murray, Maine Evidence, *supra* at § 803(3). Rule 803(3) permits admission of hearsay statements of present intention that are highly relevant and uttered under circumstances indicating a high degree of reliability, in order to show that the declarant acted in conformity therewith. Porterfield had no reason to lie to Tate; his statement that he intended to go directly home satisfied the requirement of reliability. The requirement of relevancy presents a different problem. Porterfield's statement *was* relevant to show that it was more likely than not that Porterfield indeed set out alone on his way home to Cape Elizabeth. However, the State sought to use the Porterfield statement to impeach or rebut the defendant's story that Porterfield willingly offered to take the defendant on a detour to Saco. The implication raised was that at some point the defendant forced Porterfield to detour.

It seems clear that the *Hillmon*—Rule 803(3) exception to the hearsay rule is broad enough to encompass the admissibility of so much of a declarant's plan to take further action as includes the involvement of other persons in the declarant's *plan*. *See State v. Cugliata, supra*, 372 A.2d at 1029. However, it is doubtful that the *Hillmon* exception can be used to show the actions of persons encountered by chance, like the defendant. Porterfield willingly stopped to pick up a hitchhiker, despite his averred intention to travel home alone. It is at least as likely that Porterfield offered to drive the defendant to Saco as it is that the defendant compelled Porterfield to do so. Thus, Porterfield's statement to Brian Tate does not meet the "high relevance" requirement of the Rule 803(3) hearsay exception and should not have been admitted at trial. While the presiding justice has broad discretion to determine whether a statement falls within an exception to the hearsay rule, (M.R.Evid. 104(a); *State v. Williams*, Me., 395 A.2d 1158, 1162–63 (1978)), we conclude, as a matter of law, that Porterfield's declaration did not meet the relevancy requirements of Rule 803(3) and that any relevance it did have to show Porterfield's or the defendant's conduct clearly was outweighed by its prejudicial implications. M.R.Evid. 403.

The defendant has raised other issues which he argues mandate the reversal of his conviction. In the light of our resolution of the defendant's other points of appeal in his favor, we need not review his other claims of error which are not likely to recur on a new trial.

The entry is:

Judgment vacated and case remanded to the Superior Court for further proceedings consistent with the opinion herein.

All concurring.

7. Rule 803(3), M.R.Evid. provides in pertinent part as follows: The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(3) A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition such as intent, plan, motive, design, mental feeling, pain, and bodily health,
. . . .